[No. D013551. Fourth Dist., Div. One. Feb. 18, 1992.]

PRIMO TEAM, INC., Plaintiff and Appellant, v.
BLAKE CONSTRUCTION CO., INC., et al., Defendants and
Respondents.

[No. D013552. Fourth Dist., Div. One. Feb. 18, 1992.]

PRIMO TEAM, INC., Plaintiff, Cross-defendant and Appellant, v.
AETNA CASUALTY AND SURETY COMPANY, Defendant,
Cross-complainant and Appellant.

[No. D013553. Fourth Dist., Div. One. Feb. 18, 1992.]

PRIMO TEAM, INC., Plaintiff and Appellant, v.
GOLDEN EAGLE INSURANCE COMPANY, Defendant and Respondent.

COUNSEL

Gray, Cary, Ames & Frye, Charles L. Deem and Tracy L. Nation for Plaintiff and Appellant and for Plaintiff, Cross-defendant and Appellant.

Fisch, Spiegler, Ginsburg & Ladner, Phillip L. Ginsburg and Karen M. Ladner for Defendant, Cross-complainant and Appellant.

Merrill, Schultz & Wolds, Jon F. Gauthier, John Julius and Alexander J. Olander for Defendants and Respondents.

## OPINION

**FROEHLICH, J.**—Primo Team, Inc. (Primo) appeals from judgments entered in favor of Aetna Casualty and Surety Company (Aetna), Blake Construction Co., Inc. (Blake), and Golden Eagle Insurance Company (Golden Eagle).[1] The sole issue is whether Primo's role in the construction of certain public works of improvement entitles it to pursue claims on the payment bonds issued in connection with such projects. The trial court

---

[1]Because all three matters involve common issues of law and fact, except for the particular amounts claimed by Primo, the appeals in the Blake and Golden Eagle matters were consolidated for appeal upon motion of the parties. On further reflection, we also deemed it appropriate to consolidate the Aetna matter with the Blake/Golden Eagle matter. Having done so on our own motion (*Sharick v. Galloway* (1936) 12 Cal.App.2d 733, 738 [55 P.2d 1196]), we dispose of all three matters by this single opinion. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 165, fn. 3 [188 Cal.Rptr. 104, 655 P.2d 306].)

entered summary judgments against Primo, concluding Primo's role does not qualify it as an entitled claimant on the bonds. Primo appeals, asserting its claim was proper based on the contention it furnished labor and services to the work of improvement.

We conclude the trial court correctly ruled Primo was not entitled to collect on the payment bonds, because Primo's services were rendered to a subcontractor rather than to the work of improvement. We therefore affirm.

## I. *Facts*

The material facts are not in dispute. During 1988 certain "prime contracts" were issued to various contractors to build public works of improvement, and in connection therewith the prime contractors posted public work payment bonds.[2] The prime contractors subsequently engaged subcontractor R.J. 1, Inc. (R.J.) to perform certain portions of the carpentry work on the various projects.

R.J. subsequently retained the services of Primo, pursuant to three separate "Labor Services Agreements." Under the agreements Primo initially helped R.J. in assembling its work force.[3] Primo's principal role, however, was (1) to provide ongoing services to R.J. involving various aspects of R.J.'s personnel administration, payroll and reporting functions, and (2) to advance the funds to cover the various payroll and related obligations of R.J. Specifically, Primo provided R.J.'s employees with introductory orientation materials; maintained R.J.'s personnel files; provided time clocks and time cards, which it collected and used to calculate wages, tax withholdings, employer contributions, etc.; and withheld all appropriate withholdings, preparing and filing necessary state and federal tax reports.

---

[2] In the Aetna matter, Alberici/Denver, Inc. (Alberici) was awarded the prime contract to build graduate student apartments for U.C. Irvine. In the Blake matter, Blake was awarded the prime contract to construct different residence halls for U.C. Irvine. In the Golden Eagle matter, Frank Stahl, doing business as Frank Stahl Construction Company (Stahl), was awarded a contract to construct an elementary school in Oceanside, California. The bonds posted by Alberici and Blake were issued by Aetna, and the bond posted by Stahl was issued by Golden Eagle.

[3] Although the terms of the Labor Services Agreements called for Primo to supply Primo employees to R.J. (with Primo retaining the sole authority to recruit, hire, employ, discipline and terminate the employees it leased to R.J.), indisputably the reality was substantially different. Primo actually assisted R.J. in *assembling* a work force by recruiting, interviewing and screening job applicants; by obtaining various applications and forms from prospective employees and verifying their eligibility to work for R.J. on the job; and by preparing various reports about the employees for R.J. Primo did not hire, discipline, or fire employees, nor did it provide them tools or supervise their labors on the job. Instead, all these functions were performed by the workers' actual employer, R.J.

Another part of Primo's personnel administration was the preparation and distribution of documents to R.J. employees describing the safety rules prescribed by OSHA or other safety offices. Primo also conducted weekly safety meetings with R.J. employees, at which it issued safety certificates for injury-free performance, and administered R.J.'s workers' compensation insurance program.[4]

A primary aspect of Primo's role was to advance funds for, and administer collateral functions of, R.J.'s payroll and related obligations. Primo collected R.J.'s employee time cards, calculated and paid employees' wages, withheld taxes, FICA, SDI and union dues, prepared the certified payroll reports and monthly work-hour utilization reports, and prepared and filed numerous tax documents.

Under the terms of Primo's contract with R.J., Primo's compensation was calculated upon the total amounts it advanced. R.J. was obligated to repay Primo, on a monthly basis, an amount equal to 135.7 percent of the gross wages, employer tax contributions and workers' compensation insurance premiums which Primo advanced on behalf of R.J.[5]

In April 1989, Primo and R.J. terminated their contractual relationship. Although R.J. apparently paid the first few invoices, it began defaulting on payments in March 1989. At time of default R.J. owed Primo approximately $556,000 for amounts due under the contract for the Alberici job, $597,000 for amounts due under the contract for the Blake job, and $63,000 for amounts due under the contract for the Stahl job.[6]

## II. *The Lawsuits*

In June 1989, Primo served upon Blake, Stahl and Alberici the "Preliminary Bond Notice" required by Civil Code section 3091. Primo thereafter filed three separate lawsuits seeking, among other things, payment from the various bonding companies, and claiming the right to recover for the labor, skill and other necessary services it had furnished to the respective works of improvement. After Primo avoided a preliminary challenge to its ability to

---

[4]Primo prepared and filed the injury reports mandated by OSHA; it arranged and paid the premiums for workers' compensation insurance coverage; and it obtained site inspections and safety reports from the workers' compensation insurance carrier.

[5]The 135.7 percent fee was allocated as follows: 129 percent for wages, tax contributions and insurance premiums; 4.3 percent for overhead, interest and expenses; and 2.4 percent as profit.

[6]The amount R.J. owed Primo was comprised of amounts for (1) gross wages paid to R.J.'s employees; (2) employer taxes paid on behalf of R.J.; (3) insurance premiums paid on behalf of R.J.; (4) overhead and interest expenses; and (5) Primo's profit.

state a claim, based on its failure to possess a contractor's license, the various defendants answered and discovery commenced.

Thereafter, all parties filed cross-motions for summary judgment or summary adjudication of issues. Primo contended it was qualified to collect under the bond as a person described in Civil Code section 3110 because it had furnished labor, skill or other necessary services to the work of improvement. The defendants contended Primo was not within the class of persons, as described in Civil Code section 3110, entitled to collect on the bonds. The hearings on all three matters were effectively coordinated for a single hearing. The trial court denied Primo's summary judgment motion[7] and granted the defendants' motions, concluding Primo was not within the class of persons under Civil Code section 3110 entitled to pursue claims on public payment bonds. Primo appeals.

III. *Primo Has No Right to Pursue a Claim Against the Public Payment Bond Because It Is Not a Claimant Protected by Civil Code Section 3110*

All parties agree that Primo's right to pursue payment under the bonds, if any, depends solely upon Primo's qualification as a claimant under Civil Code section 3110. That section identifies the entities entitled to pursue liens for services or materials provided to a work of improvement, as follows:

"Mechanics, materialmen, contractors, subcontractors, lessors of equipment, artisans, architects, registered engineers, licensed land surveyors, machinists, builders, teamsters, and draymen, and *all persons* and laborers of every class *performing labor upon or bestowing skill or other necessary services on*, or furnishing materials or leasing equipment to be used or consumed in or furnishing appliances, teams, or power contributing to *a work of improvement. . . .*" (Civ. Code, § 3110, italics added.)

▉ Primo claims the benefit of this statute on the theory that it "furnished" labor and other necessary services to the works of improvement (within the meaning of the *highlighted* language) because it assembled R.J.'s work force, administered the requisite payroll and related personnel tasks associated with R.J.'s work force, and performed the administrative reporting functions required of R.J.

---

[7] In the Aetna matter, the trial court also denied Primo's motion for summary adjudication of issues as to the bulk of issues, but ruled in Primo's favor on two issues. The only favorable rulings in the Aetna matter were: (1) Primo did not perform any work for which a contractor's license was required; and (2) Primo was not liable for R.J.'s acts or omissions.

## A. *The Work Force Was "Furnished" by R.J.*

Primo correctly notes the status of claimant is not limited to persons who physically labor on the actual job site, but can include entities which furnish the laborers to the site. (*Myers* v. *Alta Construction Co.* (1951) 37 Cal.2d 739, 742 [235 P.2d 1] [surveyor who supplies crews to perform actual labor is proper claimant]; *Rich-Lee Equipment Rentals, Inc.* v. *Intermountain Constr. Co.* (1978) 79 Cal.App.3d 581, 588-589 [145 Cal.Rptr. 106] [lessor who rents equipment and operators to job "furnishes" labor under lien laws].) ██ ██ Primo claims that its role in creating and administering the work force should qualify it as a "furnisher" of labor under section 3110.[8]

However, the entity which "furnished" the actual laborers was R.J., their employer. In *Sweet* v. *Fresno Hotel Co.* (1917) 174 Cal. 789 [164 P. 788], a claimant asserted lien rights under facts substantively identical to those upon which claims asserted by Primo were based. In *Sweet* the owner hired a general contractor to build a hotel. The general contractor then retained Sweet, pursuant to two different contracts, one dated April 1 and another June 1. Under the April 1 contract, Sweet was to pay and supervise the laborers, who were employees of the general contractor, and was to be compensated in an amount equal to the wages advanced plus 10 percent. However, under the June 1 contract, Sweet, as labor subcontractor, was to hire, provide, supervise and pay the wages of a labor force of his own employees to work on the hotel. The court held that Sweet was a proper lien claimant under the June 1 contract as a furnisher of labor to the work of

---

[8]It is clear that, notwithstanding the terms of the Labor Service Agreements, Primo did not hire, employ, discipline, or fire the actual workers, nor did it supervise the actual work on the job. Recognizing it was not an employer furnishing employees to the job, Primo argues it should be *deemed* within the class of permissible claimants, relying heavily on the oft-stated rule that the lien laws are to be "liberally construed." (See *John A. Artukovich Sons, Inc.* v. *American Fidelity Fire Ins. Co.* (1977) 72 Cal.App.3d 940, 946 [140 Cal.Rptr. 434]; *Nolte* v. *Smith* (1961) 189 Cal.App.2d 140, 144 [11 Cal.Rptr. 261, 87 A.L.R.2d 996].) However, the rule of liberal construction applies to the *scope of rights held* by protected claimants, and does not operate to *expand* the class of protected claimants.

The court in *Burr* v. *Peppers Cotton Lumber Co.* (1928) 91 Cal.App. 268 [266 P. 1025] rejected an analogous attempt to expand the class of lien claimants, explaining: "[T]he direction that the provisions of the act should be liberally construed was intended to require that such species of construction should be given the remedial portions of the act to claimants coming within the classes entitled to the benefit of its provisions. The rule of construction as to whether it should be liberal or strict, applicable to mechanic's lien laws, is clearly stated in Corpus Juris . . . : 'It is held in a number of cases that *provisions relating to the creation, existence or right to the lien, being in derogation of the common law, should be strictly construed, while provisions relating to the enforcement of the lien after it has once attached, being remedial in character, should be liberally construed.*' " (*Id.* at p. 273, italics added.)

improvement. However, his claim for a lien under the April 1 contract was rejected on the basis that the April contract was, as here, for the amounts advanced rather than for his performance of labor directly upon the building. (*Id.* at p. 796.) The court reasoned:

"[The April 1 contract] is not a contract by Sweet to perform labor on the building *or to have labor performed thereon by others in his employment.* It is, on his part, an agreement to assume and pay all wages due to certain classes of laborers employed on the building, and on the part of [the general contractor] an agreement to return to him the money advanced for that purpose. *The laborers to be paid thereunder were to be hired and discharged by [the general contractor] . . . . So far as the work is concerned, Sweet's only function was to act as superintendent and to pay the wages due from the contractor to the men. He was not the employer. In effect he was loaning money to the contractor* and performing service as superintendent of the work, for which he was to receive an amount equal to ten percent of the wages earned by the men. The law does not allow a lien for money loaned to a building contractor to enable him to carry out his contract . . . ." (174 Cal. at pp. 795-796, italics added.)

 Primo insists there is no specific requirement that the "furnisher" of the labor actually *employ* the laborers, and that the claimant's playing some major role in assembling the work force is sufficient. This assertion fails when measured in light of the *Sweet* reasoning, where the court allowed recovery on the second contract and denied it as to the first, precisely because the second contract involved the furnishing of a labor force *employed* by Sweet:

"It may be true . . . that the actual mode of carrying on the work and paying the men after June 1st did not differ materially in appearance from that practiced [under the April 1 contract] . . . . But this similarity was not fatal to the validity [of the June 1 contract]. The old contract was, in effect, an agreement by Sweet to advance money to pay [the payroll of the general contractor]; the new one was an agreement by [Sweet] *to bestow labor upon the building, hiring the men himself and paying their wages. . . .*" (*Sweet* v. *Fresno Hotel Co., supra,* 174 Cal. at pp. 796-797, italics added.)

Here, Primo neither employed the work force nor supervised the construction activities of R.J.'s employees. It therefore cannot be considered to have furnished the labor for which a lien is now sought.[9]

The only case cited by Primo suggesting a contrary rule is *Contractors Dump Truck Service, Inc.* v. *Gregg Const. Co.* (1965) 237 Cal.App.2d 1 [46 Cal.Rptr. 738] (*Contractors*). There, the grading contractor graded the property using equipment and operators which it rented through the claimant. The claimant's right to a lien was challenged on the basis that the claimant did not actually own the equipment but instead acted as a middleman. Under the contract, the grading contractor would inform the claimant of equipment requirements for each day, and the claimant would then contact available equipment operators and send them to the job site. The claimant paid the equipment operators based on the freight bills issued for that day's work, charging the contractor the amount of the freight bills plus 5 percent. (*Id.* at pp. 3-4.) The court concluded the claimant could be deemed to have "furnished" equipment to the job without necessarily owning the equipment. (*Id.* at p. 6.)

Primo's attempt to bring its role within the ambit of *Contractors* is unconvincing. The claimant in *Contractors* actually provided services *to the job* by furnishing the necessary equipment to the site on a daily "as needed" basis, whereas Primo rendered services *to R.J.* by first assembling and thereafter administering R.J.'s work force. More importantly, the claimant in *Contractors* operated essentially as a subcontractor, who in turn subcontracted out the actual labor to other independent operators. Primo did not provide a similar function: it was not under contract to furnish, nor did it actually furnish, labor to the job by subcontracting the work to independent carpenters.

Also, we note the *Contractors* court, in rejecting the contention that a claimant must own the equipment in order to "furnish" it, focused mainly on

---

[9]Primo insists several cases hold a person can be deemed to have "furnished" labor or materials without actually employing the laborers or owning the materials, and without being involved in the actual job site supervision of the construction activities. While the cases Primo cites do hold that a furnisher of labor need not actually supervise the work, the cases apparently involved furnishing equipment and/or labor which *was* owned or employed by the furnisher. (*Rich-Lee Equipment Rentals, Inc.* v. *Intermountain Constr. Co., supra,* 79 Cal.App.3d at p. 584 [claimant provided equipment and operators]; *Rodoni* v. *Harbor Engineers* (1961) 191 Cal.App.2d 560, 563 [12 Cal.Rptr. 924] [claimant supplied his equipment and drivers]; see also *Glassco* v. *El Sereno Country Club, Inc.* (1932) 217 Cal. 90, 92-94 [17 P.2d 703] [claimant was to arrange for all labor and materials for project, to be employed and/or purchased on behalf of owner; held that claimant had no lien for monies he expended to pay for such labor and materials].)

the proposition that a claimant can be deemed to have "furnished" labor even though he does not perform the work with his own hands, citing *French* v. *Powell* (1902) 135 Cal. 636 [68 P. 92]. (*Contractors, supra,* 237 Cal.App.2d at p. 6.) While this principle is accurate and would undoubtedly aid R.J. if it were the claimant, such principle cannot be expanded to hold that everyone associated with assembling or performing administrative services to a work force is a "furnisher" of labor to the job to which the work force is sent.

### B. *Primo Is a Mere Lender for the Majority of Its Claim*

The bulk of Primo's bond claim rests on its request for reimbursement of funds advanced to and on behalf of R.J., in the form of wages, benefits, withholdings and insurance contributions.[10] In *Sweet* and numerous other cases, the courts have consistently rejected arguments by lenders that they were proper claimants because they "furnished" necessary materials or labor by providing the funds to purchase such items. (See *Godeffroy* v. *Caldwell* (1852) 2 Cal. 489; *Peoples Nat. Bank* v. *Southern S. Co.* (1930) 105 Cal.App. 731 [288 P. 827].)

Although Primo insists it was not a mere lender, but instead "furnished" services necessary to the job, the undisputed facts show it rendered services to R.J. rather than to the job itself. Indeed, the bulk of Primo's services was personnel administration—a mere incident of its primary role of financing R.J.'s payroll obligations. (See *United States* v. *Rundle* (9th Cir. 1901) 107 F. 227, 228-229 [arrangement where bank paid contractor's employees directly was held to be loan on which bond claim would not lie].) The fact that Primo's money and services permitted R.J. to acquire the labor it furnished to the job site does not mean Primo's money and services were "furnished" to the job. (*Peoples Nat. Bank* v. *Southern S. Co., supra,* 105 Cal.App. 731.)

### C. *The Services Provided by Primo Were Not Provided to the Work of Improvement*

Primo seeks to distance itself from the "lender" line of cases and to elevate itself to a "furnisher" status by arguing that it "bestow[ed] skill or other necessary services on . . . a work of improvement." Specifically, Primo argues that many of the administrative functions it performed were necessary contributions to the work of improvement, by both aiding in the smooth functioning of R.J.'s work force and satisfying the reporting requirements placed upon R.J.

Although the services provided by Primo were beneficial and indeed necessary to R.J.'s operation as a business, such services were not bestowed

---

[10] Of the 135.7 percentage fee, 129 percent represented reimbursement of advances.

*on the work of improvement* within the contemplated purpose of the mechanic's lien law. ■ An underlying purpose of the mechanic's lien law is to ensure equity: it prevents an owner (whether he directly contracts for the labor or merely watches without objection as others improve his property) from being unjustly enriched by the labors of those who add value to his property, by permitting those who improve the value to look to the property for payment. (*Industrial Asphalt, Inc.* v. *Garrett Corp.* (1986) 180 Cal.App.3d 1001, 1006 [226 Cal.Rptr. 17].)

■ It is readily apparent that Primo's labor did not directly "improve property of another and increase its value." (*Industrial Asphalt, supra,* 180 Cal.App.3d at p. 1006.) Primo's labor instead only facilitated and enabled another party (R.J.) to perform such work. While Primo's contributions were beneficial to R.J. and its workers, enabling them to work toward enhancement of the property's value, Primo appears no different from any other entity or person whose "necessary" services provide support solely to the work force and/or the employer rather than the work of improvement itself. Thus, for example, even though providing food to a work force is undoubtedly "necessary" for the workers to labor on the work of improvement, the cook may not claim a mechanic's lien for his services. (*Clark* v. *Beyrle* (1911) 160 Cal. 306, 314-315 [116 P. 739].)

■ We have no doubt that any number of people bestow services "necessary" to the contractor's ability to furnish an effective work force to the project: attorneys, lenders and accountants are necessary to allow the employer to document, finance and file reports; secretaries and dispatchers are needed to coordinate the work force; yard mechanics are necessary to keep the needed equipment operable; etc. However necessary these services may be, they do not of themselves add value to the property. Instead, such services are provided to the employer and his workers outside of the scope of the mechanic's lien laws. (Accord, *Laurence J. Rich* v. *First Interstate* (Colo. Ct. App. 1990) 807 P.2d 1199, 1200 [attorney assisted owner to acquire, develop and construct property; held attorney not entitled to mechanic's lien because services were rendered to owner rather than bestowed upon the property].)

As the courts have explained in the factually different but substantively analogous context of the lender cases:

" 'While, therefore, money is necessary in one sense to carry on the work . . . by buying the things necessary for that work, still it is not primarily the thing necessary. It buys what is used to carry it on from others. The people who actually furnish the . . . other things necessary have the lien; the

money lender does not.' " (*Cadenasso* v. *Antonelle* (1899) 127 Cal. 382, 386 [59 P. 765].)

The same reasoning applies here. Paraphrasing *Cadenasso*, while Primo's services were necessary in one sense to carry on the work, they did not constitute the primary thing necessary, but only enabled others to carry on the work.

### IV. *Public Policy Considerations Do Not Support Judicially Expanding the Class of Protected Claimants to Include Primo*

Primo's principal policy argument is that if facilitators such as Primo are denied status as bond claimants, smaller contractors may be unable to compete for public works jobs. Primo claims that regulatory requirements for public works projects impose such extensive obligations on contractors (i.e., affirmative action guidelines, prevailing wage provisions, certified payroll requirements, etc.) that retaining an employment services company is the only practicable method for a smaller contractor to achieve compliance. If Primo is denied bond rights, the argument continues, employment services companies will be unwilling to render their services to small contractors, who will therefore be unable to compete for public works jobs.

We cannot accept this argument. Any person or firm providing goods or services effectively extends credit to small (or even large) contractors and undertakes the same risk: nonpayment if the contractor should become insolvent. Expanding the class of claimants based on Primo's policy arguments would eliminate the legislatively drawn lines separating protected from unprotected claimants, because any person who provided services could assert the contractor could not have functioned without such services. Thus, for example, a small contractor may well need a line of credit from a lender to begin or continue operating. The fact that such loan might be "necessary" does not justify judicial expansion of the legislatively limited class of claimants: " 'If it had been the intention of the legislature to give [a lender a mechanic's] lien, money would have been included under its own name and not under the general words "or any other thing necessary." ' " (*Cadenasso* v. *Antonelle*, *supra*, 127 Cal. at p. 386.)

Moreover, the central purpose of the mechanic's lien law is to prevent an owner from being unjustly enriched by the value added to his property through the work of unpaid laborers. Ordinary creditors of a contractor, however worthy, have not increased the value of the owner's land separate and apart from the value added by the contractor. To endow such creditors with lien claimant status would saddle the property with additional burdens

without increasing the property's value commensurate with such burdens, violating the equitable foundation for mechanic's lien laws.

Accordingly, we decline Primo's public policy pleas for inclusion in the class of protected claimants.

### DISPOSITION

The judgments are affirmed.

Huffman, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied March 9, 1992, and appellant's petition for review by the Supreme Court was denied May 27, 1992.