**TRI–STATE EMPLOYMENT SERVICES, INC., Plaintiff–Appellant,**

v.

**The MOUNTBATTEN SURETY COMPANY, INC., Defendant–Appellee.**

**Docket No. 01–7676.**

United States Court of Appeals, Second Circuit.

Argued: March 6, 2002.

Decided: July 09, 2002.

James M. Mulvaney, McElroy, Deutsch & Mulvaney LLP, New York, NY, for Defendant–Appellee.

Before: CALABRESI and CABRANES, Circuit Judges, and AMON,* District Judge.

CALABRESI, Circuit Judge.

Plaintiff–Appellant Tri–State Employment Services, Inc. ("Tri–State"), a New York corporation, appeals from a memorandum and order of the United States District Court for the Southern District of New York (Knapp, *J.*) granting summary judgment in favor of defendant-appellee The Mountbatten Surety Company, Inc. ("Mountbatten"), a Pennsylvania corporation. *Tri–State Employment Servs. v. Mount Batten Sur. Co.*, No. 99 Civ. 9684, 2001 WL 487423 (S.D.N.Y. May 7, 2001). Mountbatten is a licensed surety company engaged in the business of issuing bonds in connection with construction contracts. At issue in this case is whether Tri–State, a Professional Employer Organization ("PEO") or employee leasing company, is a proper bond claimant under a surety bond issued by Mountbatten to Team Star Contractors, Inc. ("Team Star") in connection with a construction project in Quincy, Massachusetts. The district court held that Tri–State was not a proper bond claimant because, as a PEO, Tri–State "certainly does not provide 'labor and materials' as the terms are used in the language of the Bonds." *Id.* at * 3. Moreover, the district court noted that Tri–State's "efforts to characterize itself as a joint employer of the laborers on the project to which the Bonds apply does not make it the provider of labor and material itself." *Id.* Tri–State argues on appeal that the district court erred in concluding that Tri–State was

William J. Turkish, Law Office of William J. Turkish, PLLC, Jericho, NY, for Plaintiff–Appellant.

---

* The Honorable Carol Bagley Amon, United States District Judge for the Eastern District of New York, sitting by designation.

merely a provider of payroll services rather than the employer or joint employer of the workers who provided labor at the construction project.

As the district court correctly acknowledged, "[n]either party cites any case, and ... independent research reveals none, dealing with the narrow issue of whether a PEO is a proper claimant under a labor and materials surety bond." *Id.* In the absence of any applicable case law in New York that would conclusively determine Tri–State's status and hence its claim under the surety bond, we have concluded that we should certify the following question to the New York Court of Appeals:

> In the circumstances presented, is a PEO, under New York law, a proper claimant under a labor and materials surety bond?

## BACKGROUND

Team Star Contractors, Inc., a New York-based construction company, entered into an agreement with O'Ahlborg & Sons, Inc. ("O'Ahlborg") to perform construction work at a site in Quincy, Massachusetts (the "Quincy project"). Mountbatten, as surety, issued two Labor and Material Bonds to Team Star as principal and O'Ahlborg as obligee, one on March 6, 1998 in the penal sum of $5,000,000, and another on March 12, 1998 in the penal sum of $1,309,600. The bonds, which are identical in form, provide in pertinent part:

> Now, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly make payment to all claimants as hereinafter defined, for all *labor and material* used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

> 1. *A claimant is defined as one having a direct contract with the Principal or with a Subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Contract,* labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

> 2. The ... Principal and Surety hereby jointly and severally agree with [O'Ahlborg] that every claimant ... who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond. . . .

(emphasis added).

In its complaint, Tri–State alleges that, in or around March 1998, it entered into an oral agreement with Team Star to provide employee leasing services. According to Tri–State, the agreement was for "TRI–STATE [to] hire Team Star's employees, lease them back to Team Star, while paying all of the former employees' payroll, wages, federal, state and municipal taxes, workmen's compensation insurance premiums, disability insurance premiums and union benefits, if applicable, and any and all incidental payments customarily required to be paid by an employer to and on behalf of its employees." Compl. at ¶ 8, *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co.,* 2001 WL 487423 (S.D.N.Y. May 7, 2001) (No. 99 Civ. 9684). Tri–State alleges that Team Star made timely payments on Tri–State's invoices until November or December 1998, at which time Team Star owed approximately $400,000 to $600,000. Tri–State initially agreed to give Team Star more time to

pay the outstanding invoices. This arrangement perdured until Team Star owed approximately $1.2 million.

On January 8, 1999, Tri–State and Team Star executed a Memorandum of Understanding (the "Memorandum") as a precondition to Tri–State's agreement to continue to provide "labor and payroll services" to Team Star for the Quincy project and the "payment of all wages, taxes and insurances in connection therewith." The Memorandum stated that Tri–State had provided "labor and payroll services" to Team Star, had "paid, on behalf of Team Star, wages, Federal, State and local employment taxes," and had "provided disability insurance and workman's compensation insurance" in connection with the O'Ahlborg subcontract agreement. Team Star acknowledged in the Memorandum that it was indebted to Tri–State in the amount of $1,113,251.90 for the provision of such services.[1]

When Team Star subsequently failed to make payments on the outstanding invoices, plaintiff filed a proof of claim on March 9, 1999 with Mountbatten, seeking payment in the amount of $1,113,251.90 under the March 6, 1998 bond. According to Tri State, Mountbatten refused payment and plaintiff brought this suit. In its response, Mountbatten asserted several affirmative defenses, inter alia, that Tri–State is not—as a matter of law—a proper claimant under the surety bond. On that basis, the district court granted Mountbatten's motion for summary judgment.

■ In doing so, the district court noted that "[n]either party [had] cite[d] any case, and ... independent research reveals none, dealing with the narrow issue of whether a PEO is a proper claimant under a labor and materials surety bond." Tri–

State Employment Servs., 2001 WL 487423, at *3. The district court pointed out that "those who can generally recover on a payment bond are subcontractors or persons supplying labor or material to subcontractors or the general contractors." Id. at *2. Conversely, creditors, such as banks and other financial institutions, which lend money to the principal, including for the purpose of meeting payroll obligations, are not proper claimants under labor and materials surety bonds. See id. at *3 (citing United States for Use and Benefit of Dorfman v. Standard Sur. & Cas. Co. of New York, 37 F.Supp. 323, 326 (S.D.N.Y.1941)). The district court then stated:

> While a PEO might serve more administrative functions than a creditor, it basically provides credit in the form of payroll services. A PEO certainly does not provide "labor and materials" as the terms are used in the language of the Bonds. The Bonds themselves define labor and materials to include "that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment applicable to the contract." The Bonds' definition of ["labor and materials"] cannot be reasonably interpreted to include payroll and human resource services.

Tri–State Employment Servs., 2001 WL 487423, at *3.

The district court also found unavailing plaintiff's argument that, as a joint employer, it was a proper claimant under the bond. The district court wrote:

> Plaintiff's efforts to characterize itself as a joint employer of the laborers on the project to which the Bonds apply does not make it the provider of labor and material itself. The fact that plain-

---

1. The amount owed by Team Star was subject to modification should Team Star and Tri– State have agreed subsequently that the records justified a different figure.

tiff paid taxes on these employees and were [sic] financially liable for them in certain instances does not change the fact that it did not furnish labor.

*Id.*

In concluding, the district court declared: "Regardless of the arrangement plaintiff had with Team Star, it did not provide labor and material under the Bonds' definition." *Id.* This appeal followed.

## DISCUSSION

### I. *Standard of Review*

We review a district court's grant of summary judgment *de novo,* drawing all factual inferences and resolving all ambiguities in favor of the nonmoving party. *See McCarthy v. Am. Int'l Group, Inc.,* 283 F.3d 121, 123 (2d Cir.2002). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lazard Frères & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.1997) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Hence, "'if, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" *Id.* (quoting *Gummo v. Vill. of Depew,* 75 F.3d 98, 107 (2d Cir.1996)). The moving party bears the burden of demonstrating the absence of any genuine factual dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citations omitted) (emphasis in original).

### II. *Choice of Law*

▮ Before considering the merits, we must decide whether New York or Massachusetts law applies to this case. A federal court sitting in diversity must apply the choice-of-law rules of the forum state, in this instance New York. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In the case before us, there is no contractual choice-of-law provision in the bonds specifying the law that is to govern their interpretation, and neither party has briefed or argued the issue.[2] Courts in

---

2. Although there is no choice-of-law provision in the bonds themselves, the Memorandum of Understanding executed by Team Star and Tri–State to memorialize their original oral agreement states:

> Nothing contained herein shall preclude Tri–State from exercising any other remedies it may have to obtain satisfaction of this indebtedness, either in a Court of law or equity. *Any such action shall be construed according to the laws of the State of New York, and venue shall be properly maintained in the County of New York, State of New York.*

(emphasis added).

It is worth noting, however, that, although there is no choice-of-law provision in the surety bonds, the bonds do have a forum selection clause that provides in relevant part:

> No suit or action shall be commenced hereunder by any claimant ... [o]ther than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the Project, or any part thereof, is situated, or in the United States District Court for the district in

New York, where the action was brought, apply a "center of gravity" or "grouping of the contacts" approach to choice-of-law issues in contract cases. Under this approach, courts may consider a variety of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *See In re Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). "[T]he traditional choice of law factors"—the places of contracting and performance—are "given heavy weight in [this] analysis." *Id.* at 226, 597 N.Y.S.2d 904, 613 N.E.2d 936 (internal quotation marks omitted). But New York courts may also consider public policy "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." *Id.*

■ Applying this test, we conclude that, under New York conflicts rules, a New York court would find that the center of gravity of the transaction was New York, and hence that New York law applies to Tri–State's claim under the surety bond. The underlying oral contract between Tri–State, a New York corporation, and Team Star, whose principal place of business is in New York City, was, according to plaintiff's complaint, negotiated in New York, *see* Compl. at ¶ 4, *Tri–State Employment Servs.* (No. 99 Civ. 9684) ("[T]he contractual arrangements entered into between the parties were made in New York and promulgated within New York."), and performed at least in part in New York.[3] Moreover, the payment bond was executed in New York.

Massachusetts, the location of the construction project subject to the payment bond, is the only other jurisdiction with

which the Project, or any part thereof, is situated, and not elsewhere.

Accordingly, it appears that, by contract, venue would lie exclusively in state courts and in the federal district court in Massachusetts, where the Quincy project is located. Nevertheless, plaintiff, citing 28 U.S.C. § 1391(a) in its complaint, averred that "[v]enue is proper within [the Southern District of New York] … inasmuch as the primary office of Tri–State is located within the jurisdiction of the United States District Court for the Southern District of New York, and the contractual arrangements entered into between the parties were made in New York and promulgated within New York." Compl. at ¶ 4, *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co.*, 2001 WL 487423 (S.D.N.Y. May 7, 2001) (No. 99 Civ. 9684).

Assuming *arguendo* the validity of the above mentioned forum selection clause (a question we need not decide), the existence of the clause is nevertheless of no moment, for at least two reasons. First, because defendant failed to raise any venue challenge in a pre-answer motion or responsive pleading, *see* Fed.R.Civ.P. 12(h)(1)(B), defendant is deemed to have waived any objection to venue. *See*

*Concession Consultants, Inc. v. Mirisch*, 355 F.2d 369, 371 & n. 1 (2d Cir.1966) ("Unlike the matter of jurisdiction venue was (and remains) a privilege personal to each defendant, which can be waived, and is waived by him unless timely objection is interposed." (internal quotation marks and citation omitted)). Second, such waiver is supported by defendant's representations to the district court that the court constituted the proper forum. Def.'s Answer at ¶ 4, *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co.*, 2001 WL 487423 (S.D.N.Y. May 7, 2001) (No. 99 Civ. 9684) ("Mountbatten admits that venue is proper in the United States District Court for the Southern District of New York."); *see Krape v. PDK Labs Inc.*, 194 F.R.D. 82, 86 (S.D.N.Y.1999) ("[A] party's … representations to the court that it is the proper forum may waive its right to subsequently raise the claim that venue lies elsewhere.").

3. Based on Tri–State's description of its activities, we presume that the administrative functions, as well as any credit-related activities, in connection with providing payroll services to Team Star were performed in New York.

significant contacts relevant to the dispute.[4] The parties do not contend, however, that Massachusetts law applies; they, instead, cite New York law regarding labor and material payment bonds in support of their arguments. The parties also rely on case law from other jurisdictions regarding PEOs that they deem persuasive as to what New York law on the matter should be. Thus, though the record is silent on whether the parties bargained for the application of New York law, we conclude—based on New York conflicts rules, the parties' reliance on New York law in their submissions and at oral argument, and the connections that New York has to this suit—that a New York court would apply New York law to the issues before us. *See, e.g., Conn. Indem. Co. v. 21st Century Transp. Co.,* 186 F.Supp.2d 264, 269 (E.D.N.Y.2002) (citing *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 98 (2d Cir.2000), and *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 121 n. 5 (2d Cir.1998)); *cf. Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989) (applying New York law "[u]nder the principle that implied consent to use a forum's law is sufficient to establish choice of law").[5]

### III. The Merits of Tri–State's Claim Under the Surety Bonds

A contract of suretyship is "[a] contract whereby one person engages to be answerable for the debt, default, or miscarriage of another." *Black's Law Dictionary.* 1442 (6th ed.1990). More specifically, a labor and material payment bond is an instrument whose function is to protect suppliers of labor and materials by guaranteeing them payment under the bond and giving them a direct right of action against the surety. As the district court correctly noted, "those who can generally recover on a payment bond are subcontractors or persons supplying labor or material to subcontractors or the general contractors." *Tri–State Employment Servs.,* 2001 WL 487423, at *2 (citing *Davis Wallbridge, Inc. v. Aetna Cas. & Sur. Co.,* 103 A.D.2d 1010, 478 N.Y.S.2d 389, 390 (App.Div. 1984)). At issue in this case is whether Tri–State, in its capacity as a PEO or employee leasing company, provided "labor and materials" in connection with the Quincy project, and hence is a proper claimant under the surety bonds issued by defendant.

■ We interpret a contract of suretyship in the same way that we do contracts in general. Restatement (Third) of Suretyship & Guaranty § 14 (1996); Restatement of Security § 88 (1941); *see People v. Backus,* 117 N.Y. 196, 201, 22 N.E. 759 (1889) ("[T]he contracts of sureties are to be construed like other contracts so as to give effect to the intention of the parties."); *see also United States ex rel. Vea-*

---

4. As in New York, there appears to be no applicable case law in Massachusetts dealing with the question of whether a professional employer organization or employee leasing company, such as Tri–State, furnishes "labor and materials" and thus is a proper bond claimant under labor and material payment bonds.

5. While we do not deem it appropriate to certify this question, since it is one of application of settled New York law, *see Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 236, 677

N.Y.S.2d 764, 700 N.E.2d 303 (1998) (declining to answer a portion of a certified question "in deference to the Second Circuit's review and application of existing principles of law to the facts"), the New York Court of Appeals is obviously free to speak to this issue under the general certification clause. *See infra.* ("We further invite the New York Court of Appeals to expand the certification to cover any additional question of New York law involved in this appeal that the Court chooses to answer.").

*ley v. Suffolk Constr. Co.*, No. 95 Civ. 9363, 1998 WL 241628, at *3 (S.D.N.Y. May 12, 1998) (Sotomayor, *J.*) (same). Under New York law, "[i]t is well settled that a surety bond attaches to the principal contract and must be construed in conjunction with it." *Carrols Equities Corp. v. Villnave*, 57 A.D.2d 1044, 395 N.Y.S.2d 800, 803 (App. Div.1977).

## A. *Tri–State's Role as a PEO*

Tri–State argues that, pursuant to its oral agreement with Team Star, it "provide[d] labor and services" at the Quincy project, as well as "additional administrative and payroll services and financing." Because there is no written agreement dating to the time that the contract was entered into, a resolution of the issues appears to require examination of the Memorandum's characterization of Tri–State's role, as well as the several depositions of Tri–State management that are included in the record.

Tri–State is a corporation consisting of five divisions: (1) Temporary Services, (2) Systems Solutions (MIS Services), (3) Telemarketing, (4) Permanent Placement, and (5) a Professional Employer Organization. The Professional Employer Organization, of which Team Star became a client, does employee leasing. It appears that a purpose of employee leasing is to outsource certain back office functions, especially human resources, thereby enabling the employer to reduce the costs associated with these administrative functions and to benefit from the economies of scale offered by the employee leasing firm.[6] *See* Martha L. Hutzelman, *Current Issues with Contingent Employees, Leased Employees, and Independent Contractors: An Overview of Employee Outsourcing Arrange-*

*ments,* ALI–ABA Continuing Legal Education Course of Study (September 16, 1999), *available at* SE04 ALI–ABA 465, 471.

Neil Messina, a member of Tri–State's management team, described the company's normal PEO operations as follows:

> What employee leasing means is that ... a company like us goes into a client company and handles most of the human resources functions for the company, maintaining employee files, handbooks, so on and so on. We provide employee benefits.... We provide workers' compensation, and we become their payroll department. All they're doing, in essence, is taking all the vendors that they are currently doing business with now and they are consolidating it to one vendor.

On a weekly basis, the client company—in this case, Team Star—faxes timesheets or a roster of employees indicating the number of hours worked by each employee during the week. Tri–State is responsible for processing the payroll and either distributing the paychecks, which Tri–State issues out of its own bank account, to the client company or directly to the workers. For these services, Tri–State is paid a fee that reflects a seventeen to nineteen percent markup on the wages. From the markup, Tri–State pays withholding taxes and insurance premiums, and keeps a profit of approximately two percent.

The record suggests that typically a client company transfers its employees to Tri–State's federal ID number so that the workers are then placed on Tri–State's payroll. These workers complete and submit I–9 and W–4 forms to Tri–State, and the forms are then matched up with the

---

6. It is worth nothing that the outsourcing arrangement can be structured in many different ways, besides hiring a PEO. Examples include the use of temporary staffing agencies and contract employees.

client company's list. The I–9 and W–4 forms are, according to Tri–State, "the only hiring paperwork." Although Tri–State's president, Robert Cassera, at first suggested in a deposition that Tri–State sometimes interviews the workers that it places on its payroll, he eventually conceded that it was not "common practice" to do so.[7]

The depositions also reveal that Tri–State does not maintain a physical presence at the job site nor does it decide which workers go into each job each week or what their hourly wage rates are. Moreover, Tri–State does not conduct performance evaluations of the workers on its payroll, take any disciplinary action against them, or take any action to terminate a leased worker. Rather, "[t]he client maintains direction and control[,] . . . [m]aintains daily supervision over the employees[,] and does all the hiring and firing. [Tri–State is] the client's back office, so to speak."

## B. Possible Views of Tri–State's Status Under the Bonds

■ The district court stated that there is no New York case law that determines as a matter of law whether a PEO is a proper claimant under a labor and materials payment bond. Moreover, neither case law in this Circuit nor precedents from other jurisdictions provides a conclusive answer to the question of whether, in its capacity as a PEO, Tri–State is a valid bond claimant. We are unable to determine whether, under New York law, a professional employer organization gener-

ally, and Tri–State more specifically, should be regarded as more analogous to (1) a creditor that finances payroll expenses, (2) an administrative services vendor that provides payroll and human resource services, (3) the employer of the construction workers, or (4) a joint employer—together with the client—of the workers.

### 1. Is Tri–State Acting Primarily as a Payroll Financier and Creditor?

Mountbatten argues that the record demonstrates that "Tri–State merely operated as a financier and 'back office' for Team Star's operations" and is seeking reimbursement for advances that it made on behalf of Team Star to the workers who furnished labor in connection with the Quincy project. Accordingly, Mountbatten contends that Tri–State is not a proper bond claimant because it did not perform physical labor or provide materials in connection with the performance of the Quincy project.

If Tri–State is treated as a lender or creditor, as Mountbatten suggests is appropriate, then New York law would appear to suggest that it cannot be a proper bond claimant. See Uvalde Asphalt Paving Co. v. City of New York, 191 N.Y. 244, 246–47, 84 N.E. 83 (1908) (stating that New York's lien statute, intended to protect the providers of labor and materials, does not protect those who advanced or loaned funds to contractors); Troy Public Works Co. v. City of Yonkers, 68 Misc. 372, 124 N.Y.S. 307, 311 (Sup.Ct.1910) (stating that New York's lien law "cannot be con-

---

7. The following is an excerpt from Robert Cassera's deposition:

> Q. Do you or anyone in your company personally interview these PEO employees before putting them on your payroll?
> A. [Robert Cassera] Yes, they do.
> Q. Who is they?
> A. Usually the sales rep will actually sign them up too.

> Q. Does the sale [sic] rep interview every employee before—
> A. Not necessary. It is not necessary.
> Q. So is that answer sometimes they do and sometimes they don't?
> A. Yes. It is not something that we do, that is common. It is not a common practice for us.

strued so broadly as to cover money loaned to a contractor to be used and actually used ... in the performance of the contract work"); *see also Md. Cas. Co. v. Bd. of Water Comm'rs of City of Dunkirk*, 66 F.2d 730, 738 (2d Cir.1933) ("There is no provision in the bond requiring the surety to pay lenders of money.... The supply of money does not constitute 'furnishing materials.' ").

Various other jurisdictions hold that a lender or creditor cannot be a proper bond claimant. Courts in these jurisdictions have held that banks and other financial institutions that serve as lenders and entities that function solely as creditors do not furnish labor and materials, even if their advances of money facilitate the provision of labor and materials by the principal. *See, e.g., Hardaway v. Nat'l Sur. Co.*, 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321 (1909) (holding that those who bound themselves to superintend a job and furnish money to complete the work, in exchange for a fee, were not subcontractors who undertook to furnish labor and materials upon a contract with the original contractor); *Vill. of Cambridge v. Hartford Accident & Indem. Co.*, 253 F.2d 599, 601 (7th Cir.1958) (holding that a person who entered into an agreement with a contractor to order and purchase materials and hire labor, to pay for these from his funds, and to seek reimbursement from the contractor was not a proper bond claimant because his advance to the contractor "was an outright loan and nothing more"); *see also Gulf Ins. Co. v.* *GFA Group, Inc.*, 251 Ga.App. 539, 554 S.E.2d 746, 748–49 (Ga.Ct.App.2001) (holding that, in a case involving a statutory bond intended to protect subcontractors and materialmen, an entity that had entered into an agreement with a contractor to "issue payroll checks on its own account, remit the withheld taxes to the appropriate authorities, pay the workers' compensation premiums, and submit its invoice to the [c]ontractor weekly for immediate repayment" was acting, in part, as "a lender rather than a supplier of labor or materials," and as a provider of administrative services "for the benefit of the [c]ontractor," and hence was not a proper claimant on the bond); *Primo Team, Inc. v. Blake Constr. Co.*, 3 Cal.App.4th 801, 4 Cal. Rptr.2d 701, 702–03 (Cal.Ct.App.1992) (holding that an entity whose principal role was to provide ongoing personnel administration, payroll, and reporting services to a subcontractor, and to advance funds to cover the various payroll and related obligations of the subcontractor was akin to a creditor and hence was not a proper bond claimant[8]). Whether New York law is similar or differs from the law in these jurisdictions is, of course, for the New York Court of Appeals to say, should it accept certification.

2. *Is Tri–State a Provider of Administrative Services Rather Than a Provider of Labor and Materials?*

In granting summary judgment in favor of Mountbatten, the district court found

---

**8.** Primo Team assisted the subcontractor in "assembling" a work force by recruiting, interviewing, and screening job applicants, by obtaining various applications and forms from prospective employees and verifying their eligibility to work for the subcontractor, and by preparing various reports about the employees for the subcontractor. *Primo Team*, 4 Cal.Rptr.2d at 703 n. 3. And, a primary aspect of Primo Team's role was "to advance funds for, and administer collateral functions of, [the subcontractor's] payroll and related obligations." *Id.* at 703. The California court rejected Primo Team's claim under the payment bonds, noting, *inter alia*, that Primo Team's "primary role [was] financing [the subcontractor's] payroll obligations." *Id.* at 707. The court observed that "[t]he vast bulk of Primo's bond claim rest[ed] on its request for reimbursement of funds advanced to and on behalf of [the subcontractor], in the form of wages, benefits, withholdings and insurance contributions." *Id.* at 706.

that, as a corollary to what it perceived to be Tri–State's primary function as a payroll financier, Tri–State "serve[d] ... administrative functions," including the provision of "payroll and human resource services." *Tri–State Employment Servs.,* 2001 WL 487423, at *3. These services, the district court held, did not meet the bonds' definition of labor and materials. *Id.* ("The Bonds themselves define labor and materials to include 'that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment applicable to the contract.' The Bonds' definition ... cannot be reasonably interpreted to include payroll and human resource services.").

Such a result appears to be consistent with the conclusion reached in cases involving mechanic's liens—which, like surety bonds, are intended to protect suppliers of labor or materials. These cases regularly hold that only those providing *physical* labor, rather than technical and professional skill, are intended beneficiaries of payment bonds. *See, e.g., United States ex rel. Olson v. W.H. Cates Constr. Co.,* 972 F.2d 987, 990 (8th Cir.1992) ("[T]he term 'labor' ..., as generally in statutes relating to mechanics' liens, refers to physical labor rather than technical and professional skill and judgment."); *Walsh v. Int'l Fidelity Ins. Co.,* 55 Misc.2d 565, 285 N.Y.S.2d 327, 329 (N.Y.Civ.Ct.1967) ("The question ... for the court is whether [an] attorney's services can be considered the work of a 'laborer' within the meaning of the bond. I think not. The common and ordinary signification of the term labor accords with the definition given by the best lexicographers, and is understood to be physical toil.").

### 3. *Tri–State's Legal Status as an Employer*

Tri–State contends, instead, that the district court erred because, by characterizing Tri–State's activities as having the elements of both a lender and a service provider, it failed to draw the inference that Tri–State was also a provider of labor by virtue of its status as the *employer* of the workers who were involved in the Quincy project. Tri–State argues, *inter alia,* that it is treated as an "employer" under the Internal Revenue Code, myriad labor and employment laws such as the Fair Labor Standards Act, the Family Medical Leave Act, Title VII, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Equal Pay Act, and the Immigration Reform and Control Act, and other statutory authorities. Such legal status, it maintains, warrants the conclusion that Tri–State was the provider of labor and, thus, a proper bond claimant.

It is up to the New York Court of Appeals to decide definitively whether there is any merit to Tri–State's argument that it is treated as an employer under various laws and, as such, ought to be permitted to recover under a labor and materials surety bond. Nevertheless, the Court might find informative the conclusions of California courts on this issue. In particular, California courts have accepted an analogous argument, and, distinguishing *Primo Team, Inc. v. Blake Constr. Co.,* 3 Cal.App.4th 801, 4 Cal.Rptr.2d 701 (Cal. Ct.App.1992), have held that "the legal status of an employer of laborers furnished to a work of improvement is the crucial factor which distinguishes a person who 'furnishes' such laborers to the project ... from a person who merely organizes the work force, performs administrative functions, advances wages, or does all three in behalf of another." *Contractors Labor Pool, Inc. v. Westway Contractors, Inc.,* 53 Cal.App.4th 152, 61 Cal.Rptr.2d 715, 721 (Cal.Ct.App.1997) (emphasis omitted). In *Primo Team,* the court noted that Primo

Team did not hire, discipline, or fire employees, nor did it provide them tools or supervise their labor. *Primo Team*, 4 Cal. Rptr.2d at 703 n. 3. And, the *Primo Team* court found that Primo Team was not a proper bond claimant because "Primo neither employed the work force nor supervised the construction activities" of the subcontractor's employees.[9] *Id.* at 706.

By contrast, in *Contractors Labor Pool, Inc. v. Westway Contractors, Inc.*, 53 Cal. App.4th 152, 61 Cal.Rptr.2d 715 (Cal.Ct. App.1997), Contractors Labor Pool ("CLP") entered into an agreement with Westway, which provided, *inter alia*, (1) that Westway would pay CLP an hourly rate for each hour that a *CLP employee* performed services for Westway, (2) that CLP would be responsible for the employees' payroll taxes, workers' compensation and other insurance premiums, federal and state withholding, and fringe benefits, (3) that Westway would control the activities of the employees while on the job, and (4) that Westway would indemnify CLP for damages to persons or property arising out of work performed or not performed by the employees and/or Westway in connection with the labor agreement. *Id.* at 718.

The *Westway* court held that CLP was a proper bond claimant because it had the legal status of employer, unlike the claimants in *Sweet v. Fresno Hotel Co.*, 174 Cal. 789, 164 P. 788 (Cal.1917),[10] and *Primo Team*. Elaborating, the *Westway* court stated:

The designation of a person as the "employer" of another is not a mere label. . . . Rather, such designation signifies a legal relationship in which the employer has legal responsibilities to the employee and to third parties, which are absent where a person merely supervises another's employees or disburses to such employees wages which are due from the other person to the employees. . . .

*Westway*, 61 Cal.Rptr.2d at 722 (emphasis omitted).

### 4. Is Tri–State a Joint Employer with Team Star?

Tri–State claims, alternatively, that, even if the courts determine that, by virtue of its services as a PEO, it may not properly be regarded as the sole employer of the construction workers, it is nevertheless a provider of labor and thus a proper claimant under the bond because, for certain labor and employment law purposes, Tri–State can be considered to be a *joint or co-employer* with Team Star of the laborers. We note that such legal status would appear to make, in this case, either (1) Tri–State and Team Star jointly liable for compliance with the myriad laws that apply in a traditional employment relationship, or (2) Team Star secondarily liable to Tri–State under such laws. But, we decline to speculate on whether the fact that Tri–State may be considered to be a joint employer in some statutory contexts has any bearing on its contractual rights in this case. While we express no view on the issue, we do note that one possible

**9.** In accord with *Primo Team*, the Georgia Court of Appeals emphasized similar facts, and stated that, where the record shows that the contractor was responsible for "acquiring and terminating employees" and the plaintiff did "not retain control over the employees nor direct their behavior in any way," the plaintiff did not provide labor and, thus, was not a proper bond claimant. *Gulf Ins. Co.*, 554 S.E.2d at 748–49.

**10.** In *Sweet*, the California Supreme Court held that a person who contracted to act as superintendent and to pay the wages due from the contractor to the workers, *but was not the employer*, was not a proper bond claimant. *Sweet*, 164 P. at 790–91.

implication of Tri–State's legal status as a joint employer might be that Tri–State would not be a proper claimant under the bond. We do not know whether New York courts would find that, if Tri–State is a joint employer and hence jointly liable with Team Star for employment obligations (including wages), Tri–State should not be entitled to recover under the bond.

### 5. *Is the Question of Tri–State's Status Essentially a Factual One?*

Despite its conclusion that *legal* status as employer was crucial, the California court in *Westway* noted that "[u]ltimately, the nature of the relationships among [the parties] is a question of fact." *Id.* The trial court in that case had made the following findings:

(1) the workers were interviewed, screened and hired by CLP according to its own procedures and applying its own employment criteria; (2) the employees signed applications for employment with CLP and also signed written conditions of employment identifying them as employees of CLP; (3) CLP provided employees with its own standard "Employee Handbook"; (4) while Westway had a right to reject or "send back" any worker sent to the jobsite by CLP, Westway had no right to go farther and terminate the worker's employment with CLP; (5) the workers' time cards and other personnel documents identified them as CLP employees; (6) CLP covered the employees with its own workers' compensation insurance policy; (7) when Westway fell into default in payments to CLP, CLP threatened to withdraw workers from the project, not to stop processing or paying payroll for Westway.

*Id.* at 723 (emphasis omitted).

And, though the *Westway* court held that the legal status of being an employer is the deciding factor, it also cited the factual attributes that made CLP an employer. Its emphasis on factual findings is particularly suggestive in a case such as this one in which all concerned seem to play down such facts.[11] Thus, Tri–State cites several statutory authorities that allegedly support its contention that it *is* an employer and has assumed the legal consequences of such status, while Mountbatten marshals arguments that Tri–State's status—as a matter of law—is that of a creditor or a provider of administrative services. Similarly, the district court, in ruling for Mountbatten, engaged in no analysis of whether there were material facts in dispute.

There being no New York authorities, we do not know what weight to give to the potentially intensely fact-dependent conse-

---

**11.** The role that Tri–State played in the Quincy project is in many ways distinct from that played by CLP in the California case. It appears, for instance, that Tri–State, unlike CLP, did not interview or screen the workers according to its own employment criteria, that the workers did not file job applications with Tri–State or sign written conditions of employment with Tri–State, that the only documents that identify the Quincy project workers as "employees" of Tri–State are the W–4 and I–9 forms by which the workers were transferred to Tri–State's federal ID number for payroll purposes, and the paychecks, which "read Tri–State Employment Services, serviced through the . . . client's name," and that, unlike CLP, Tri–State did not provide the workers with any employee handbooks or materials. Moreover, there is no indication that Tri–State had authority to hire or discipline the workers or to supervise their labor at the job site. In fact, when Team Star defaulted in its payments, Tri–State did not withdraw the workers from the project (as CLP did), but rather terminated its relationship with Team Star by cutting off the financing of Team Star's payroll.

quences of employee leasing.[12] Nor do we know whether New York law employs presumptions in this context to guide the fact finding that may be involved.

Among other things, at issue then, is (1) whether, under New York law, Tri–State's designation as an employer on employment forms by itself warrants a finding that Tri–State furnished labor and hence is a proper bond claimant, or (2) whether what really matters are the attributes of being an employer, rather than the technical classification, and, if so, which ones are to be emphasized. We thus leave it to the New York Court of Appeals to determine the significance, if any, of the resolution of such questions.

## CONCLUSION

As the preceding discussion makes clear, we are uncertain about what view of Tri–State's role the New York courts would adopt. In addition, it is unclear whether New York courts (1) would choose to establish a presumption that a PEO is a creditor, or a provider of administrative services, or an employer, or a joint employer, or (2) would insist on a case-by-case factual approach. Because this case presents novel and potentially dispositive state-law questions, we believe that it is an appropriate case for certification to New York's highest court. We, further, believe that guidance from the New York Court of Appeals is warranted here because the PEO industry has developed only recently and is experiencing fast growth. *See generally* H. Lane Dennard, Jr. & Herbert R. Northrup, *Leased Employment: Character, Numbers, and Labor Law Problems,* 28 Ga. L.Rev. 683, 695–98 (1994). As a result, the questions presented to us today—and others implicating PEOs—are likely to arise again in the future with increasing frequency. Moreover, and significantly, this is not a case in which the potential delay entailed by certification jeopardizes the interests of the parties.

Accordingly, we hereby respectfully certify the following question to the New York Court of Appeals:

> In the circumstances presented, is a PEO, under New York law, a proper claimant under a labor and materials surety bond?

We further invite the New York Court of Appeals to expand the certification to cover any additional question of New York law involved in this appeal that the Court chooses to answer. This panel retains jurisdiction to consider all issues that may remain before us once the Court of Appeals has either provided us with its guidance or declined certification.

---

12. These might involve, for instance, an analysis of which entity maintains a common law employment relationship with the worker. Thus, for federal employment tax purposes, it has generally been found that, pursuant to the common law, "the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished." Treas. Regs. § 31.3401(c)–1(b); *see id.* § 31.3121(d)–1(c)(2) (same); *see also Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323–24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (applying a similar common law test to determine employee status for purposes of ERISA). In addition, the IRS has provided guidelines listing twenty factors that are to be identified and weighed as part of the process of determining if there is an employer-employee relationship. *See* Rev. Rul. 87–41, 1987–1 C.B. 296. And, even a cursory review of the statutory authorities makes clear that a worker may be viewed in one context (for example, for employment tax and employee benefit purposes) as a common-law employee of one entity and in another context (for instance, for employment discrimination purposes) as the employee of another.

It is therefore ordered that the Clerk of this Court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with a complete set of the briefs, appendices, and record filed in this Court by the parties.

### CERTIFICATE

The foregoing is hereby certified to the Court of Appeals of the State of New York, pursuant to 2d Cir. R. § 0.27 and N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17, as ordered by the United States Court of Appeals for the Second Circuit.