**INTERDIGITAL COMMUNICATIONS CORPORATION et al.,**
Petitioner,

v.

**NOKIA CORPORATION, Respondent.**

No. 05 Civ.6180 WHP.

United States District Court,
S.D. New York.

Dec. 28, 2005.

Mark D. Flanagan, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Petitioners.

Patrick J. Flinn, Alston & Bird, LLP, Atlanta, GA, for Respondent.

### MEMORANDUM AND ORDER

PAULEY, District Judge.

Petitioners InterDigital Communications Corporation and InterDigital Technology Corporation (collectively, "InterDigital") bring this action to confirm an International Chamber of Commerce ("ICC") arbitration award dated June 11, 2005. A majority of the three member ICC panel (the "Panel") found respondent Nokia Corporation ("Nokia") liable to InterDigital for approximately $250 million in royalty payments (the "Award"). InterDigital moves to confirm the Award and Nokia moves to vacate it.

This action presents the all too common denouement of international arbitrations— relitigation in federal court. The sophisticated parties to this dispute negotiated an agreement that included a sweeping arbitration clause and relinquished their right to try their claims in federal court. The arbitration was conducted on mutual consent and each party was represented by able counsel. Nokia now seeks a fresh analysis of the issues already presented to and decided by the Panel.

However, the public policy in favor of arbitration is strong. For this reason, the

law discourages district judges from redoing the work of arbitrators. A federal court will entertain a request for vacatur only in the most egregious circumstances. While this Court does not necessarily agree with every finding of the Panel, there is nothing so aberrant about the Award to require vacatur. For the reasons set forth below, this Court confirms the Award in its entirety.

## BACKGROUND

### I. *Nokia Obtains a License to InterDigital's Patents*

InterDigital is a wireless telecommunications technology developer that earns substantial revenue by licensing its patents. Nokia is a manufacturer of cell phone handsets ("handsets") and network equipment ("infrastructure"). In January 1999, InterDigital and Nokia entered into a series of agreements granting Nokia access to InterDigital's patented technologies. The dispute here focuses on the Patent License Agreement dated January 29, 1999 (the "PLA") (Declaration of William J. Merritt, dated July 1, 2005 ("Merritt Decl.") Ex. B), as well as a Master Agreement dated January 29, 1999 (the "Master Agreement") which applies certain general terms and conditions to the PLA (Merrit Decl. Ex. C).

The PLA grants Nokia a license to make, use and sell handsets and infrastructure using InterDigital's technology. In return, Nokia agreed to pay $31.5 million in royalties to cover all sales prior to January 1, 2002 ("Period 1"). (PLA § 3.1.1(A).) From January 1, 2002 through December 31, 2006 ("Period 2"), Nokia's royalty obligations were contingent on InterDigital issuing a license to at least one of Nokia's three "Major Competitors." (PLA § 3.1.2(D)(i).) The Master Agreement defines "Major Competitor" as "Lucent Technologies, Inc., Ericsson, Inc."

("Ericsson"), and Motorola, Inc., and their successors or assigns, including purchasers of the assets related to the matters covered under the [PLA]." (Master Agreement Ex. 1 ¶ 28.) If InterDigital successfully entered into a "Major Competitor License Agreement" ("MCLA"), Nokia would pay royalties on "equivalent terms and conditions" as the Major Competitor. (PLA § 3.1.2(C).)

Nokia's Period 2 royalty rates are thus determined by the rates set forth in the MCLAs. If there is only one MCLA covering a particular subject matter (for example, handsets), then the MCLA automatically establishes Nokia's rate for that subject matter. (PLA § 3.1.2(C).) If multiple MCLAs cover the same subject matter, Nokia may choose among the MCLAs. (PLA § 3.1.2(C), (D)(iii).) In any event, Nokia's royalty obligations are governed by a "most favored licensee" provision, meaning that Nokia's royalty payments would be no higher than those paid by the Major Competitors. (PLA § 3.1.2(B).) The PLA also entitles Nokia to a credit against its Period 2 royalty payments in the event that Nokia effectively pays a higher rate in Period 1 than the Major Competitors. (PLA § 3.1.2(C).)

In March 2003, InterDigital entered into two patent license agreements material to this action: one with Ericsson (the "Ericsson Agreement" or the "Ericsson MCLA"), and another with Sony Ericsson Mobile Communications ("Sony Ericsson") (the "Sony Ericsson Agreement" or the "Sony Ericsson MCLA"). (Award ¶ 3.) Ericsson is one of the Major Competitors enumerated in the Master Agreement. (Master Agreement Ex. 1 ¶ 28.) Sony Ericsson is a joint venture between Sony Corporation and Ericsson. (Award ¶ 41.) In creating the joint venture, Ericsson sold its handset business to Sony Ericsson for cash consideration. (Award ¶ 41.)

After consummating the purported MCLAs with Ericsson and Sony Ericsson, InterDigital requested approximately $500 million in royalty payments from Nokia. Nokia disputed its obligations and invoked its right to arbitration under the Master Agreement. The Master Agreement provides:

> The parties shall attempt to amicably resolve all disputes arising under this Agreement or under the [PLA] ... If such dispute is not resolved ..., the dispute shall be submitted to arbitration and shall be resolved by binding arbitration by three arbitrators in accordance with the then prevailing rules for commercial arbitration ... of the [ICC]. The language of the Arbitration shall be English language and the place of the Arbitration shall be New York City.

(Master Agreement § 4.1.)

## II. *The Arbitration Award*

The Panel was convened in New York City to resolve the parties' dispute. (Award ¶¶ 6, 10.) Pursuant to the Master Agreement, the dispute was governed by New York law.[1] The Panel heard evidence from January 17 to January 27, 2005, and rendered its 34–page Award on June 11, 2005.[2] (Award ¶ 10.)

The Panel first considered whether Sony Ericsson should be considered a "Major Competitor," as that term is defined by the Master Agreement. The Panel concluded that Sony Ericsson is a "purchaser of the assets" belonging to Ericsson (a Major Competitor) and therefore, the Sony Ericsson Agreement qualifies as an MCLA. (Award ¶¶ 44–49.)

The Panel next determined, pursuant to the PLA's "sequential tender provisions," that the Ericsson MCLA covers only infrastructure, and the Sony Ericsson MCLA covers only handsets. (Award ¶¶ 30–31.) This determination requires Nokia to pay the lower infrastructure royalty rates set forth in the Ericsson MCLA and the higher handset rates set forth in the Sony Ericsson MCLA for Period 2. (Award ¶ 31.) The Panel used the same findings to determine Nokia's Period 1 credit. (Award ¶¶ 81, 83.) Nokia argued to the Panel that utilizing the MCLAs in this manner amounted to a violation of the PLA's implied covenant of good faith and fair dealing. (Award ¶ 36.) The Panel disagreed. (Award ¶ 36.)

The Panel needed to calculate the rates paid by Ericsson and Sony Ericsson, respectively, to determine the amount owed to InterDigital under the PLA. For each Major Competitor, the Panel calculated separate rates for Period 1 and Period 2. (Award ¶ 59.) The parties disputed the appropriate source of the Sony Ericsson rate. The Sony Ericsson MCLA sets forth royalty rates to be applied to Sony Ericsson's handset sales (the "Contractual Rates"). (Award ¶ 25.) However, by operation of the Sony Ericsson MCLA, Sony Ericsson is entitled to, and has in fact obtained, discounts on the Contractual Rates. (Award ¶ 25.) These discounts include price caps and reduced payments for camera phones. (Award ¶ 25.) As a result of the discounts, the royalty rates actually imposed on Sony Ericsson (the "Effective Rates") are lower than the Contractual Rates. Nevertheless, the Panel used the Contractual Rates as the basis for

---

1. Section 8.3 of the Master Agreement provides: "The validity and interpretation of this Agreement and the Related Agreements shall be governed by New York law, without regard to conflict of laws principles."

2. Many of the Panel's conclusions are undisputed and therefore do not require discussion.

**528**

Nokia's handset royalty rates. (Award ¶ 87.)

The Sony Ericsson MCLA also affords Sony Ericsson prepayment discounts on its royalty payments. (Declaration of Mark A. McCarty, dated August 1, 2005 ("McCarty Decl.") Ex. G § 3.4(c).) The Panel awarded Nokia a similar prepayment option from the date of the Award forward. (Award ¶ 90.)

The net effect of these rulings was to require Nokia to pay royalties of approximately $250 million for Period 2, including prejudgment interest of five percent per annum. (Award ¶ 96.) To date, Nokia has neither paid nor placed in escrow any portion of this Award.

Nokia now seeks vacatur by challenging six facets of the Award: (1) the characterization of Sony Ericsson as a Major Competitor; (2) the determination that Ericsson is not a Major Competitor for handsets; (3) the Panel's methodology for calculating the Major Competitors' rates; (4) the time limitations placed on the prepayment rights awarded to Nokia; (5) the award of prejudgment interest to InterDigital; and (6) the determination that InterDigital had not breached the covenant of good faith and fair dealing.

## DISCUSSION

### I. *Manifest Disregard of the Law*

The Award was rendered against a foreign corporation (Nokia) in an arbitration proceeding conducted under the rules of the ICC. Further, the dispute between the parties arose out of a commercial agreement that contemplated and resulted in performance outside the United States. Thus, this proceeding is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"). 9 U.S.C. § 202. The Federal Arbitration Act ("FAA") provides that on the application of a party to an arbitration award made pursuant to the New York Convention, a district court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

■ Section 10 of the FAA sets forth narrow circumstances under which judicial vacatur is appropriate. *See* 9 U.S.C. § 10(a). Pursuant to Section 10, this Court may vacate an arbitration award where: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing or refusing to hear evidence pertinent to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a). None of these statutory grounds for vacating an award apply here.[3]

■ In addition to the statutory grounds codified in the FAA, an arbitration award may be vacated based on the judicially-created doctrine of "manifest dis-

---

**3.** Nokia's argument that the Panel "exceeded its authority," thereby violating FAA § 10(a)(4), is misplaced. This Court's "inquiry under § 10(a)(4) ... focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir.1997). Pursuant to the Master Agreement's broad arbitration clause, the Panel plainly had the authority to reach the issues disputed by Nokia. (Master Agreement § 4.1.)

regard of the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986). There is a two-pronged test to ascertain whether an arbitrator has manifestly disregarded the law. First, a court must consider whether "[t]he governing law alleged to have been ignored by the arbitrators [was] well defined, explicit, and clearly applicable." *Bobker*, 808 F.2d at 934. Second, courts examine the knowledge actually possessed by the arbitrator. *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 209 (2d Cir.2002). The arbitrator "must appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it." *Westerbeke*, 304 F.3d at 209 (citations omitted). Both of these prongs must be met before a court may find that there has been a manifest disregard of the law. *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir.1998). The party urging vacatur has the burden to establish manifest disregard. *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997); *Folkways Music Pubs., Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir.1993).

■ A court's inquiry under the manifest disregard doctrine is "severely limited." *DiRussa*, 121 F.3d at 821. An arbitration award must be upheld on "even a barely colorable justification for the outcome reached." *Willemijn*, 103 F.3d at 13.

■ Pursuant to the Master Agreement's choice of law provision, this Court will examine whether the Panel manifestly disregarded the substantive law of New York. (Master Agreement § 8.3.) Contrary to Nokia's assertions, the Master Agreement's substantive choice of law provision does not require that the law of New York respecting challenges to arbitration awards should be applied here. *See generally Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (general choice of law clauses do not incorporate state law governing arbitrators). The parties agreed only to a general "governing law" clause which is silent as to the standard of review to be applied to arbitral awards. Therefore, the choice of law clause does not require this Court "to import New York's decisional law regarding 'manifest disregard' and displace federal law interpreting the FAA." *I Appel Corp. v. Katz*, No. 02 Civ. 8879(MBM), 2005 WL 2995387, *10 N. 8, 2005 U.S. Dist. LEXIS 26972, at *31 n. 8 (S.D.N.Y. Nov. 9, 2005).

### A. Major Competitor Provision

■ Nokia first challenges the Panel's characterization of Sony Ericsson as a Major Competitor. This issue turns on the Panel's interpretation of the Master Agreement provision that defines "Major Competitor" as "Lucent Technologies, Inc., Ericsson, Inc., and Motorola, Inc., and their successors or assigns, including purchasers of the assets related to the matters covered under the [PLA]." (Master Agreement Ex. 1 ¶ 28.) Nokia claims that Sony Ericsson failed to purchase a sufficient portion of Ericsson's assets to qualify as a Major Competitor under this definition. It is undisputed that Sony Ericsson is not one of the three enumerated Major Competitors, nor is it a "successor" or "assign." Therefore, if Sony Ericsson is to be a Major Competitor, it must qualify as a "purchaser[ ] of the assets related to the matters covered under the [PLA]."[4] Nokia contends that the word "the," when modifying the word "assets," means *all* of the assets covered under the PLA. Thus, the phrase "the assets related to the matters

---

**4.** The Panel concluded, and Nokia concedes here, that this phrase expands on the traditional meaning of the terms "successor" and "assign." (Award ¶ 44.)

covered under the [PLA]" purportedly means *the whole group* of assets related to *the whole group* of matters covered under the PLA. According to Nokia, Sony Ericsson is disqualified from being a Major Competitor because Ericsson contributed some, but not all, of its assets to Sony Ericsson.

 Nokia made a similar argument to the Panel. (Award ¶ 42.) The Panel concluded that Nokia's interpretation of the Master Agreement led to an absurd result. The Panel reasoned:

> "The matters covered under the [PLA]" cannot refer to *all* the matters covered under the PLA. If that were so, then, if a Major Competitor such as Motorola were to divest itself of, for example, its ... Third Generation Assets (Third Generation being a Covered standard under the PLA ...), and then transfer[ ] its entire assets, relating to both infrastructure and handsets, to a purchaser ... the purchaser would not qualify as a "successor" if it is a requirement that the assets in question should relate to all of the Covered Standards and equipment. This makes no sense.

(Award ¶ 46.) The Panel had more than a "colorable" basis for its interpretation. It is hornbook law that a contract should be interpreted so as not to render its terms nonsensical. *See, e.g., In re Lipper Holdings, LLC,* 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unrea-

sonable or contrary to the reasonable expectations of the parties." (citations omitted)); *Fourth Branch Assocs. v. Niagara Mohawk Power Corp.,* 302 A.D.2d 780, 782, 754 N.Y.S.2d 783, 786 (3d Dep't 2003) ("Particular words should be considered ... in the light of the obligation as a whole and the intention of the parties as manifested thereby."); *Reape v. New York News, Inc.,* 122 A.D.2d 29, 30, 504 N.Y.S.2d 469, 470 (2d Dep't 1986) ("[W]here a particular interpretation would lead to an absurd result, the courts can reject such a construction in favor of one which would better accord with the reasonable expectations of the parties."). The Panel did not ignore New York law. To the contrary, the Award applies the law that contracts should be interpreted in a sensible fashion.[5] This was a legitimate basis for the Panel's conclusion that Sony Ericsson is a Major Competitor under the PLA.

 Moreover, Nokia requests vacatur of the Panel's interpretation of the Master Agreement simply because it disagrees with that interpretation. This Court declines to disturb the Panel's rendering of the contract. "[A]n arbitrator's ... contractual interpretation is not subject to judicial challenge, particularly on [this Court's] limited review of whether the arbitrator manifestly disregarded the law." *Westerbeke,* 304 F.3d at 214; *see also Components Corp. v. Raytheon Co.,* No. M 82(HB), 2005 WL 1561508, at *4 (S.D.N.Y. June 29, 2005). Interpretation of a contract term is within the province of

---

5. It is true that the Panel's reasoning appears to contradict a different portion of the Award which purports to uphold the "plain and ordinary meaning" of the contract, rather than deviate from that meaning to achieve a sensible result. (*Compare* Merritt Decl. Ex. A ¶ 46, with ¶ 49.) However, "internal inconsistencies within an arbitral judgment are not grounds for vacatur." *Westerbeke,* 304 F.3d

at 211; *Saint Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199,* 116 F.3d 41, 44–45 (2d Cir.1997). Moreover, even when a portion of an arbitral decision is ambiguous or confusing, this Court need only find that the award is not "inexplicable" in order to deny vacatur. *Hardy v. Walsh Manning Sec., L.L.C.,* 341 F.3d 126, 132 (2d Cir.2003).

the arbitrator and will not be overruled simply because this Court might disagree with that interpretation. *See I/S Stavborg v. Nat'l Metal Converters, Inc.*, 500 F.2d 424, 432 (2d Cir.1974) ("Whatever arbitrators' mistakes of law may be corrected, simple misinterpretations of contracts do not appear one of them."); *In re Proto*, No. 99 Civ. 3056(CBM), 2000 WL 1593350, at *3 (S.D.N.Y. Oct.24, 2000) ("Proto's argument is that the panel's award violated general contract law. However, this court cannot vacate an arbitration award on this ground."); *Consol. R.R. Corp. v. Metro. Transp. Auth.*, No. 95 Civ. 2142(LAP), 1996 WL 137587, at *19 (S.D.N.Y. Mar.22, 1996) ("The reviewing court is not to substitute its own judgment of the facts or interpretation of the contract for that of the arbitrators, even when convinced they were plainly wrong."). Indeed, "[w]hether the Panel's interpretation of the [Master Agreement] or [Nokia's] interpretation of it is correct is immaterial. Courts do not have the power to review the merits of arbitrators' contract interpretations." *Sevenson Envtl. Servs., Inc. v. SAAP Battery Site Group*, No. 04 Civ. 0670(JFK), 2004 WL 936764, at *4 (S.D.N.Y. Apr.29, 2004). Because the Panel based its decision on an interpretation of the Master Agreement, that interpretation must stand. *I Appel Corp.*, 2005 WL 2995387, *11, 2005 U.S. Dist. LEXIS 26972, at *34 (holding that when an arbitrator explicitly considers a contractual term, its construction of the term will not be overruled).

**B.** *Sequential Tender Provisions*

■ The parties do not dispute that the Ericsson Agreement is the only MCLA to cover infrastructure, which binds Nokia to the infrastructure rates set forth therein. However, the parties disagree as to which MCLA sets Nokia's rates for handsets. The Panel concluded, and Interdigital urges this Court to confirm, that the

Sony Ericsson Agreement is the only MCLA covering handsets. (Award ¶¶ 30–31.) This would require Nokia to pay the higher rates set forth in the Sony Ericsson MCLA. (Award ¶ 31.) Nokia agrees that the Sony Ericsson MCLA covers handsets, but contends that the Ericsson MCLA covers handsets as well. If this were true, the PLA would allow Nokia to choose the Ericsson MCLA's lower rate for handsets over the higher rate imposed by the Sony Ericsson MCLA.

■ To demonstrate manifest disregard of the law, a party must identify a governing principle of law and show that the Panel "appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Westerbeke*, 304 F.3d at 217. Nokia does not meet that burden. Nokia draws this Court's attention to no principle of law—let alone willful circumnavigation of that principle by the Panel—that would compel vacatur. *See Shaw Group, Inc. v. Triplefine Int'l Corp.*, No. 01 Civ. 4273(LMM), 2003 WL 22077332, at *3 (S.D.N.Y. Sept.5, 2003) (declining to vacate arbitration award where the party requesting vacatur "cites to no legal principles which the arbitrator was aware of but ignored"); *In re HBLS, L.P.*, No. 01 Civ.2025(JGK), 2001 WL 1490696, at *10 (S.D.N.Y. Nov.13, 2001) (same). Vacatur is inappropriate when the requesting party fails to address the elements of the manifest disregard standard.

■ Nokia's contentions again boil down to a disagreement with the Panel over contract interpretation. As discussed above, this Court will not second guess the Panel's contract interpretation. *Westerbeke*, 304 F.3d at 214; *Components Corp.*, 2005 WL 1561508, at *4 ("While Raytheon contends that the arbitrators acted with

manifest disregard of the law, it cites to no law that was disregarded. Rather, Raytheon's underlying argument is that the Panel wrongly interpreted the Supply Agreement."). Even if this Court were to entertain Nokia's argument, it would find a colorable basis for the Panel's interpretation of the PLA. *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 392 (2d Cir.2003). For example, the Panel concluded that Ericsson exited the handset market. (Merrit Decl. Ex. A ¶ 30.) Nokia contests the Panel's conclusion, but this Court is obliged to accept the factual findings of the arbitrators. *Westerbeke,* 304 F.3d at 214.

The record also indicates that Nokia itself argued to the Panel that the Ericsson MCLA covers infrastructure but not handsets—the same contention Nokia now disputes. For example, in an arbitration submission dated September 8, 2004, Nokia stated: "[T]he license granted to Ericsson, Inc. is a license for infrastructure to a Major Competitor. There is no Major Competitor license for handsets." (Declaration of Nathan J. Walker dated August 27, 2005 ("Walker Decl.") Ex. 21 at 2.) Later, at a January 17, 2005 hearing, Nokia's counsel argued to the Panel that Interdigital "only got an infrastructure license from Ericsson ... There is no Period 2 handset license." (Walker Decl. Ex. 8 at 117.) Nokia contends that it subsequently took the position at arbitration that the Ericsson MCLA covers both infrastructure and handsets. (Walker Decl. Ex. 13 at 28.) The Panel could have concluded, based on a plausible interpretation of New York law, that Nokia "is precluded from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding." *Nestor v. Britt,* 270 A.D.2d 192, 193, 707 N.Y.S.2d 11, 12 (1st Dep't 2000); *see also Zanghi v. Laborers' Int'l Union of N. Am.,* 21 A.D.3d 1370, 801 N.Y.S.2d 646 (4th Dep't 2005); *Pace v. Assessor of Town of Islip,* 252 A.D.2d 88, 91, 682 N.Y.S.2d 447, 450 (2d Dep't 1998). Regardless of whether this Court agrees with the rationale, there is colorable support for this aspect of the Award.

This Court also confirms the Panel's determination of Nokia's Period 1 credit. (Award ¶¶ 76–83.) Having concluded that the Ericsson MCLA applies to infrastructure and the Sony Ericsson MCLA applies to handsets, the Panel required that the credit be determined by: (1) applying Ericsson's royalty rate for Period 1 sales to Nokia's Period 1 infrastructure-related sales; and (2) applying Sony Ericsson's royalty rate for Period 1 to Nokia's Period 1 handset-related sales. (Award ¶¶ 81, 83.) This conclusion rests on the Panel's interpretation of the sequential tender provisions which this Court upholds. Accordingly, the Panel's award of the Period 1 credit to Nokia will not be disturbed.

### C. *Rate–Setting Provisions*

▇▇▇ Nokia contests two aspects of the Panel's interpretation of the PLA's rate-setting provisions: (1) the appropriate time period for calculating the Major Competitor rates; and (2) the source from which the Major Competitor rates should be drawn.

### i. *The Time Period for Calculating Major Competitor Rates*

The parties disagreed at arbitration over what time periods to use in calculating the Major Competitors' rates. The basic rate-setting provisions of the PLA are found in Section 3.1.2(C), which sets forth the method for calculating the rates paid by the Major Competitors. Section 3.1.2(C) provides:

> In determining the appropriate [Period 2 royalty] payment [for Nokia], all

payments made, or to be made, by such competitor under the applicable agreement shall be considered to arrive at the per unit royalty or percentage-based royalty rate, if more appropriate, (for the purposes of this section, a per unit rate or percentage based rate being "Royalty Rate") being paid by such competitor for sales during Period 1 and Period 2. In determining the applicable Royalty Rate separately for Period 1 and Period 2, the analysis shall take into account all relevant factors.

(i) Once such royalty rates have been determined, that Royalty Rate for Period 2 shall be applied to sales made by Nokia and its affiliates during Period 2. In addition, the Royalty Rate for Period 1 shall be applied to sales made by Nokia and its Affiliates during Period 1 to determine if Nokia is entitled to any credit against Period 2 payments . . .

(PLA § 3.1.2(C).) Nokia argued that Section 3.1.2(C) requires that for each Major Competitor, a single rate combining Periods 1 and 2 be calculated. InterDigital disagreed, claiming that for each Major Competitor, Section 3.1.2(C) calls for the calculation of two separate rates—one for Period 1 and another for Period 2.

The Panel carefully examined the PLA to resolve the disagreement. As explained in the Award:

> The second sentence of Article 3.1.2(C) refers to a royalty "rate" (singular) which is to be arrived at, considering all payments made, or to be made, by the relevant competitor. Therefore, on its own, this sentence, referring as it does to a "royalty rate" (singular, not plural), appears to support Nokia's argument. However, the next sentence (the third sentence of Article 3.1.2(C)) appears to indicate

otherwise. It speaks of determining the applicable royalty rate (still singular) "separately for Period 1 and Period 2", taking into account "all relevant factors". The concept of determining a rate separately for each Period appears to be more consistent with InterDigital's position.

(Award ¶¶ 52–53.) The Panel was unable to resolve the issue looking solely at the express terms of the PLA. The Award states: "The relevant sentences in Article 3.1.2(C) appear to us to be difficult to reconcile and to be ambiguous on this issue. Therefore, in accordance with New York law, we are entitled to look at extrinsic evidence, including evidence of the parties' preliminary negotiations." (Award ¶ 53.) The Panel found a basis in the extrinsic evidence to conclude that the term "rate" in Section 3.1.2(C) was intended by the parties to refer to multiple rates. For example, Nokia itself rejected the proposal for a combined rate during negotiations. (Award ¶ 55.) Expert testimony also established that the word "rate" in the context of licensing does not necessarily mean one rate, but can refer to a schedule of rates. (*See, e.g.,* Walker Decl. Ex. 8 at 962–970.) Accordingly, the Panel concluded that Section 3.1.2(C) requires the Major Competitor rates to be calculated separately for Periods 1 and 2. (Award ¶ 59.)

This Court will not reject the Panel's good faith interpretation of the PLA. Indeed, the Panel's examination of extrinsic evidence to resolve an ambiguity accords with the governing principles of contract law. *See, e.g., Ruthman, Mercadante & Hadjis, P.C. v. Nardiello,* 260 A.D.2d 904, 906, 688 N.Y.S.2d 823, 825 (3d Dep't 1999) ("If the court concludes that a contract is ambiguous, extrinsic evidence may be considered to discern the meaning of the contact."); *CV Holdings, LLC v. Artisan Advisors, LLC,* 9 A.D.3d 654, 657, 780

N.Y.S.2d 425, 428 (3d Dep't 2004) (same); *Schindler Elevator Corp. v. Eklecco*, 302 A.D.2d 584, 755 N.Y.S.2d 301 (2d Dep't 2003) (same); *Manchester Tech., Inc. v. Didata (N.Y.) Inc.*, 303 A.D.2d 726, 757 N.Y.S.2d 439 (2d Dep't 2003) (same). The Panel had a reasonable basis for its decision to calculate separate Major Competitor rates for Periods 1 and 2.

### ii. *Source of the Applicable Rate*

■■■■ Nokia disagrees with the Panel's use of the Contractual Rates as the basis for Nokia's handset royalty payments. According to Nokia, the PLA requires that the Effective Rate be used instead. Section 3.1.2(C) directs that the Major Competitor rate be calculated by "considering" the "payments made, or to be made" by Sony Ericsson for its "sales during Period 1 and Period 2." Nokia contends that this language compels using the Effective Rate as the exclusive basis for Nokia's Period 2 handset rates.

InterDigital counters that nothing in Section 3.1.2(C) required the Panel to utilize the Effective Rate. The language on which Nokia relies merely directs the Panel to "consider" the royalty payments Sony Ericsson made to InterDigital; it does not require the Panel to adopt the Effective Rate as the basis for Nokia's royalty payments. Rather, the Panel may reject that approach, and instead adopt an approach contained elsewhere within Section 3.1.2(C). This is precisely what the Panel did. The Panel relied on Section 3.1.2(C)'s requirement that Nokia's Period 2 rate should be fixed at "equivalent terms and conditions as those set forth in the [MCLA]," and applied the Contractual Rate as a result. (Award ¶ 87).

Nokia has failed to identify a principle of law that was ignored by the Panel in arriving at its conclusion. *Shaw Group*, 2003 WL 22077332, at *3. Yet again, Nokia disagrees only with the Panel's interpretation of the PLA. This Court will not "substitute its own ... interpretation of the contract for that of the arbitrators, even when convinced that they were plainly wrong." *Consol. R.R. Corp.*, 1996 WL 137587, at *19. In any event, the Panel provided a "colorable justification" for its decision to use Contractual Rates as a basis for Nokia's Period 2 handset rates. *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir.2004); *Postlewaite v. McGraw-Hill, Inc.*, No. 98 Civ. 0611(LLS), 1998 WL 751687, at *3 (S.D.N.Y. Oct.26, 1998).

### D. *Prepayment Option*

■■■■ Sony Ericsson's royalty obligations are reduced by amounts specified in the Sony Ericsson MCLA when it makes its royalty payments ahead of schedule. (McCarty Decl. Ex. G § 3.4(c).) The Panel awarded Nokia a similar prepayment option. (Award ¶ 90.) However, under the Award, Nokia acquires its prepayment rights only "in respect of the remainder of Period 2," *i.e.*, after the Award was issued on June 11, 2005. (Award ¶ 90.) Nokia complains that it should have been awarded prepayment rights for the entirety of Period 2.

Because this claim involves solely the interpretation of the PLA, this Court's limited review under the manifest disregard doctrine precludes vacatur. *Andros Compania Maritima S.A.*, 579 F.2d 691, 703 (2d Cir.1978). Regardless, the Panel had a colorable basis for limiting Nokia's ability to prepay. Nokia has yet to make any Period 2 payments, let alone prepayments. Sony Ericsson is only entitled to a prepayment discount when it actually prepays (McCarty Aff. Ex. G § 3.4(c)(ii)), and Nokia's prepayment rights contain the exact same limitation (PLA § 3.1.2(C)).

■■■■ Nor will this Court speculate as to how much Nokia might have prepaid had it

not initiated arbitration instead. It is Nokia's burden to prove manifest disregard of the law. *Willemijn*, 103 F.3d at 12. A party requesting damages for breach of contract must prove the extent of its losses. *See, e.g., Outokumpu Cooper USA, Inc. v. Am. Architectural Metals, Inc.*, 1 A.D.3d 336, 766 N.Y.S.2d 870, 871 (2d Dep't 2003); *Desai v. Blue Shield of Ne. New York Inc.*, 178 A.D.2d 894, 896, 577 N.Y.S.2d 932, 934 (3d Dep't 1991). However, Nokia offers no evidence as to whether, when, and how much it intended to prepay. Without any support for its request for retroactive prepayment rights, Nokia has failed to state a claim for damages. Indeed, the purpose of the prepayment discount is to compensate the licensee both for the forgone opportunity to invest its money, and for the risk of overpayment, since pre-payments are not refundable. Having chosen not to prepay, Nokia has retained the use of its money and avoided the risk of overpayment.

### E. *Prejudgment Interest*

██ The Panel awarded prejudgment interest to InterDigital in the amount of five percent per annum from the start of Period 2 through the date of the Award. (Award ¶ 96.) Nokia contends that a more limited prejudgment interest award is required by the PLA. PLA Section 3.1.2(D)(v) states:

> To the extent that Nokia was not paying royalties (due to there being no [MCLA]), any payments to be made by Nokia for sales during Period 2 but prior to the effective date of the [MCLA] shall be made with interest, compounded annually, using an interest rate of 5%.

According to Nokia, the accrual of prejudgment interest should therefore terminate at January 1, 2003, the date both MCLAs became effective.

This Court disagrees. New York law clearly requires that prejudgment interest be computed "to the date the verdict was rendered or the report or decision was made." N.Y. C.P.L.R. § 5001(c). Nothing in Section 3.1.2(D)(v) demonstrates InterDigital's willingness to limit its right to prejudgment interest. At the very least, the Panel had a reasonable basis for its conclusion. Section 3.1.2(D)(v) excuses payment "due to there being no [MCLA]." However, the Section does not excuse payment due to Nokia's initiation of a proceeding against InterDigital. Nokia withheld its payments pending arbitration, thereby denying InterDigital the use of approximately $250 million in royalty payments. Prejudgment interest is necessary to compensate InterDigital for the opportunity cost Nokia imposed on InterDigital by initiating arbitration.

### F. *Covenant of Good Faith and Fair Dealing*

██ Nokia argued to the Panel that InterDigital violated the covenant of good faith and fair dealing contained in the PLA. The PLA awarded "most favored licensee" status to Nokia, meaning Nokia was protected from a competitive disadvantage resulting from more favorable terms being granted to a Major Competitor. (PLA § 3.1.2(B).) As described in detail above, Nokia claims that InterDigital should not have demanded royalty rates from Nokia that were based on the rates paid by Sony Ericsson. As most favored licensee, Nokia claims to have been entitled to the more favorable rates paid by Ericsson. Nokia also contends that being made to pay Sony Ericsson's Contractual Rate, versus the Effective rate, stripped Nokia of its most favored licensee rights because it entailed higher royalty rates than those InterDigital offered to Major Competitors.

██ An implied covenant of good faith and fair dealing inheres in every New York contract. *See Travellers Int'l. A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir.1994); *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995). The covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002). "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified." *Restatement (2d) Contracts* § 205(d).

Nokia argues that the Panel misstated New York law by requiring Nokia to demonstrate subjective bad faith on the part of InterDigital, when a breach of good faith may arise even when the breaching party lacks scienter. The language in the Award flatly contradicts Nokia's position. In setting out the law of good faith and fair dealing, the Panel held that "[t]he obligation of good faith may be violated even if the actor believes his conduct to be justified." (Award ¶ 32.) The Panel also applied this objective standard of good faith and fair dealing to the facts before it. The Award states: "We ... find that the negotiation of the Ericsson and Sony Ericsson Agreements, and the terms thereof, *do not result in Nokia being effectively deprived of the express, explicitly bargained-for benefits of the PLA* and its related agreements." (Merrit Decl. Ex. A ¶ 36 (emphasis added).) The Panel plainly adhered to the law of good faith and fair dealing.

## II. *Essence of the Agreement*

██ Nokia also requests vacatur on the grounds that the Award is not derived from the "essence of the agreement." The essence of the agreement doctrine permits vacating an arbitration award that relies on considerations of equity, rather than the express terms of the relevant contract. *See, e.g., In re Marine Pollution Serv.,* 857 F.2d 91, 95 (2d Cir.1988). However, the Second Circuit has "traditionally confined the 'essence of the agreement' doctrine to review of arbitration awards issued under collective bargaining agreements." *Westerbeke,* 304 F.3d at 221. The Court of Appeals indicated in *Westerbeke* that it "may be especially reluctant" to apply the doctrine to commercial arbitration awards. 304 F.3d at 222. Indeed, Nokia cites to no precedent in this Circuit, and this Court is aware of none, in which the doctrine is used to vacate a commercial arbitration award. This Court highly doubts that the essence of the agreement doctrine is applicable to the Court's consideration of a commercial arbitral award.

Regardless, the essence of the agreement doctrine compels the same outcome here as the manifest disregard of the law standard. For each of the disputed questions discussed above, the Panel's conclusions were grounded in the relevant agreements. "Interpretation of these contract terms is within the province of the arbitrator and will not be overruled simply because we disagree with that interpretation." *Yusef Ahmed Alghanim & Sons. W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 25 (2d Cir.1997). For each of the contract terms, Nokia "merely takes issue with the arbitrator's well-reasoned interpretations of those provisions, and simply offers its own contrary interpretations." *Yusuf,* 126 F.3d at 25. Nokia's assertion that notions of fairness and equity distracted the Panel from a good faith appraisal of the agreements is contradicted by the Award's explicit and repeated reliance on the PLA and Master Agreement.

## CONCLUSION

For the foregoing reasons, InterDigital's motion to confirm the arbitration award is granted and Nokia's motion to vacate the arbitration award is denied. The Clerk of the Court is directed to mark this case closed.

SO ORDERED.