## GLOBAL REINSURANCE CORPORATION OF AMERICA, Petitioner,

v.

## ARGONAUT INSURANCE COMPANY, Respondent.

No. 07 Civ. 7514 (WHP).

United States District Court, S.D. New York.

March 23, 2009.

Jeffrey S. Leonard, Esq., Joseph J. Schiavone, Esq., Ivan Miletic, Esq., Virginia A. Pallotto, Esq., Budd Larner, PC, Short Hills, NJ, for Petitioner.

Dan E. LaBelle, Esq., Halloran & Sage LLP, Westport, CT, Theresa W. Hajost, Esq., Daniel A. Blumenthal, Esq., Halloran & Sage LLP, Washington, DC, for Respondent.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge:

Petitioner Global Reinsurance Corporation of America ("Global") brings this action to confirm an arbitration award dated July 12, 2007, and amended on August 23, 2007 (the "Award"). A majority of the three arbitrators found Respondent Argonaut Insurance Company ("Argonaut") liable to Global for $1,975,747.55 of claims under reinsurance agreements between the parties. Global also moves for post-award/pre-judgment interest and attorneys' fees. Argonaut moves to vacate the Award in part. For the following reasons, Global's petition to confirm the Award in its entirety and for post-award/pre-judgment interest are granted. Global's motion for attorneys' fees and Argonaut's motion to vacate part of the Award are denied.

*BACKGROUND*

I.  *The Commutation*

Global and its predecessor companies provided reinsurance to insurance companies, including Home Insurance Company ("Home"). (Declaration of Virginia A. Pallotto dated Aug. 24, 2007 ("Pallotto Decl.") ¶ 2.) Global reinsured a portion of the risks under its reinsurance contracts with Home by entering into retrocessional reinsurance contracts with various retrocessionaires including Argonaut.[1] (Pallotto Decl. ¶ 2.) In 2003, Global reached a settlement and commutation agreement with Home settling all outstanding claims and releasing Global from its reinsurance contracts with Home for a lump-sum payment (the "Home Settlement"). (Declaration of Christopher Hollender dated Sept. 17,

---

1.  For an explanation of the reinsurance business, *see generally Canada Life Assurance Co. v. Converium Rückerversicherung (Deutsch-* *land) AG,* 210 F.Supp.2d 322, 324 (S.D.N.Y. 2002).

2007 ("Hollender Decl.") Ex. C: Final Arbitration Award dated July 12, 2007 ("Final Award") at 3.) The Home Settlement included existing liabilities as well as certain contingent liabilities. (Final Award at 3.) With the help of a consulting agency, Global used actuarial methods to allocate the lump-sum settlement as "claims" among the various retrocessionaires with whom Global had reinsured its Home exposure, including Argonaut. (Final Award at 3–4.) At issue in this litigation are thirteen "claims" totaling $1,689,296.50 arising from the Home Settlement that were allocated by the consulting agency to Argonaut. Nine of these "claims" were liability claims that Home submitted to Global and are not challenged by Argonaut in this proceeding. Four of the "claims" represented contingent liabilities where Home released Global as part of the Home Settlement (the "Commutations"). (Final Award at 2–3.) Argonaut contests the Commutation claims which represent $544,942.15 of the total Award. (Final Award Schedule A.)

## II. *The Treaties*

Global's predecessor entered into two retrocessional reinsurance agreements with Argonaut (the "Treaties"). (Pallotto Decl. Ex. A: Second Excess of Loss Casualty Retrocessional Contract effective May 1, 1970 through June 30, 1972 ("Treaty I"); Ex. B: Second Excess of Loss Casualty Retrocessional Contract effective July 1, 1972 through June 30, 1975 ("Treaty II").) As amended, both Treaties contain similar terms.

The Treaties provide that Argonaut's liability is limited to casualty business having an "ultimate net loss over and above $250,000 ... each and every loss occurrence...." (Treaty I at 2.) The Treaties state that a "Loss Occurrence ... shall follow the definition of that term or any similar term as appearing in the [Original Reinsurance Contract] out of which the loss arises ... [and] [s]hould no definition appear, then a Loss Occurrence shall mean any one disaster, casualty accident or loss or series of disasters, or casualties, or accidents or losses arising out of or caused by one event or occurrence." (Treaty II, Endorsement No. 2 dated May 7, 1974 effective from inception of Treaty I.) Also, the Treaties provide that "[Argonaut] agrees to abide by the loss settlements of [Global], it being understood, however, that when so requested [Global] will afford [Argonaut] an opportunity to be associated with [Global] at the expense of [Argonaut], in the defense of any claim or suit or proceeding involving this reinsurance...." (Treaty I at 8.)

The Treaties also contain a notice provision that "[Global] shall advise [Argonaut] with reasonable promptitude of any accident or event in which [Argonaut is] known to be involved and shall on demand, provide [Argonaut] with full information relative thereto." (Treaty I at 7.) This notice provision also reiterates that Argonaut the "right to cooperate with [Global] in the defense and/or settlement of any claim in which [Argonaut] may be interested." (Treaty I at 7.)

The Treaties require that all disputes between the parties be resolved in arbitration and that the arbitrators "are relieved from all judicial formalities and may abstain from the strict rules of law, interpreting the [Treaties] as an honorable engagement rather than a merely legal obligation." (Treaty I at 10.) The Treaties reiterate this in a separate article labeled "Honorable Undertaking" which provides that "[the Treaties] shall be construed as an honorable undertaking between the parties hereto not to be defeated by technical legal constructions, it is the intention of [the Treaties] that the fortunes of [Argonaut] shall follow the fortunes of [Global]." (Treaty I at 9.)

Finally, the Treaties provide that "[e]ach party shall pay the fee to its own arbitrator and half of fees of the umpire, and the remaining costs of the arbitration shall be paid as the award shall direct." (Treaty I at 10.)

## III. *The Arbitration*

Global billed the thirteen "claims" arising out of the Home Settlement to Argonaut in September 2004. (Pallotto Decl. Ex. C: Letter from Jeffrey S. Leonard to Donald C. Buyck dated Dec. 30, 2004 ("Demand Letter") at 1.) Argonaut refused to pay them and Global demanded arbitration. (Demand Letter at 1–2.)

The Arbitration took place in New York City before one arbitrator selected by each party and an umpire (the "Panel"). (Pallotto· Decl. ¶ 4.) The Panel issued its Final Award on July 12, 2007. (Pallotto Decl. ¶ 5.) The arbitrator selected by Argonaut dissented from the Final Award. (Final Award at 6.)

At the arbitration, Argonaut raised two primary arguments in support of its contention that it should not have to pay Global for these "claims." First, Argonaut argued that Global had failed to give it notice of these claims as required by the Treaties. Second, Argonaut argued that the Commutations were not "claims" under the Treaties because they did not fit within the coverage defined by the Treaties. Both arguments were unavailing.

The Final Award states that "these retrocessional agreements are contracts of indemnity," and "where such contracts include a Loss Settlements provision, [Argonaut] surrenders control of claims handling and agrees to follow [Global's] settlements...." (Final Award at 4.) It also states that "[n]otwithstanding the inclusion of a loss settlements provision in the retrocessional agreement, [Global] still must insure that the loss is within the terms of its

original reinsurance contract." (Final Award at 4.)

The Final Award concludes that "[t]he evidence presented at the Hearing established that the ... claims comprising the commutation transaction [with Home] were covered by the original reinsurance contracts issued by [Global]." (Final Award at 4.) The question for the Panel was "whether a loss settlement, as used in these [Treaties], includes compromise of liability under all the [Original Reinsurance Contracts] as distinct from the liability of an individual loss settlement under a single [Original Reinsurance Contract]." (Final Award at 4.) Noting that "virtually all loss settlements, both in insurance and reinsurance, involve compromise and include a so-called contingent component ...." and that "the comprehensive nature of the commutation between [Home] and [Global] represents a distinction without a difference to the validity of a loss settlement under the [Treaties][,]" the Panel found the Commutations were covered by the Treaties. Having concluded that the Commutations were covered by the Treaties, the Panel determined that the allocation methodology was reasonable. (Final Award at 4.) The Panel also determined that the nine remaining claims were covered under the Treaties and properly allocated. Accordingly, the Panel awarded Global the full amount it sought in arbitration. While the Panel awarded pre-award interest, it declined to award attorneys' fees to Global. (Final Award at 5–6.)

On August 23, 2007, the Panel issued an Order Clarifying the Final Award. (Pallotto Decl. Ex. E: Order Clarifying Final Award dated Aug. 23, 2007 ("Amending Order").) The clarification was entered by agreement of the parties and reflected payments Argonaut had made previously on some of the claims. (Amending Order at 1.) The Panel reduced the Award by the

amount of the payments and adjusted pre-award interest accordingly, leaving a total award (including interest) of $1,975,747.55. (Amending Order at 1.) On August 24, 2007, Argonaut sent Global a check paying the full amount of the Amended Award, while reserving its rights to seek vacatur of the Award in any confirmation proceeding. (Hollender Decl. Ex. E: Letter from Christopher Hollender to David Ramos dated Aug. 24, 2007.)

Argonaut only challenges the Final Award to the extent that the Panel found that Argonaut was responsible for paying the Commutations. Argonaut contends that the Panel manifestly disregarded the law with respect to the Commutations in three aspects. First, Argonaut asserts that the Panel ignored the unambiguous provision of the Treaties requiring that Global provide notice of claims and an opportunity for Argonaut to associate itself with any claim before it must accept liability. Second, Argonaut argues that the Panel ignored the unambiguous definition of "Loss Occurrence" in the Treaties by finding that the contingent liabilities allocated to Argonaut based on actuarial studies were losses covered under the Treaties. Finally, Argonaut argues that the Panel misapplied the "follow the fortunes" doctrine to expand the coverage of the Treaties.

## DISCUSSION

### I. *Legal Standard*

██ "Under the terms of [Section 9 of the Federal Arbitration Act], a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected as prescribed in [Sections] 10 and 11." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 1402, 170 L.Ed.2d 254 (2008). " 'It is well established that courts must grant an arbitration panel's decision great deference." ' *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d

85, 90 (2d Cir.2008) (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir.2003)). Pursuant to Section 10 of the Federal Arbitration Act, this Court may vacate an arbitration award where *inter alia:* "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *Inter-Digital Commc'ns Corp. v. Nokia Corp.*, 407 F.Supp.2d 522, 528 (S.D.N.Y.2005). In this Circuit, arbitrators may exceed their powers if the arbitration is carried out with "manifest disregard" of the law. *See Stolt–Nielsen*, 548 F.3d at 95.

While *Stolt–Nielsen* requires this Court to determine whether the arbitrators acted with "manifest disregard", other Circuits have abandoned that test in the wake of the Supreme Court's decision in *Hall Street. See, e.g., Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349 (5th Cir.2009); *Ramos–Santiago v. United Parcel Serv.*, 524 F.3d 120, 124 n. 3 (1st Cir.2008). *Hall Street* concluded that Sections 10 and 11 are the exclusive grounds for review under the Federal Arbitration Act, and suggested that "manifest disregard" may have been "short hand for § 10(a)(3) or § 10(a)(4)." *See Hall Street*, 128 S.Ct. at 1404. Adopting the view of the Seventh Circuit in *Wise v. Wachovia Sec., LLC*, 450 F.3d 265 (7th Cir.2006), the Second Circuit recognizes the "manifest disregard doctrine and the [Federal Arbitration Act] itself, as a mechanism to enforce the parties' agreements to arbitrate rather than as judicial review of the arbitrators' decision." *Stolt–Nielsen*, 548 F.3d at 95. But the principle is "very narrow." *See Citigroup Global Markets*, 562 F.3d at 357 ("Because the arbitrator is fully aware of the controlling principle of law and yet does not apply it, he flouts the law in such

a manner to exceed the powers bestowed upon him.").

■ "The party seeking to vacate an award on the basis of the arbitrator's alleged 'manifest disregard' of the law bears a 'heavy burden.'" *Stolt–Nielsen*, 548 F.3d at 91 (quoting *GMS Group, LLC v. Benderson*, 326 F.3d 75, 81 (2d Cir.2003)). A reviewing court may "vacate an arbitral award only in 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent.'" *Stolt–Nielsen*, 548 F.3d at 91–92 (quoting *Duferco*, 333 F.3d at 389). A court should enforce an award as long as "there is a barely colorable justification for the outcome reached." *Stolt–Nielsen*, 548 F.3d at 92 (citations and quotation marks omitted). The court may not vacate an award "merely because it is convinced that the arbitration panel made the wrong call on the law." *Stolt–Nielsen*, 548 F.3d at 92 (citations and quotation marks omitted).

■ "There is a two-pronged test to ascertain whether an arbitrator has manifestly disregarded the law. First, a court must consider whether the governing law alleged to have been ignored by arbitrators was well defined, explicit, and clearly applicable. Second, courts examine the knowledge actually possessed by the arbitrator." *InterDigital*, 407 F.Supp.2d at 529 (internal citations and quotation marks omitted); *see also In re Arbitration Between Interdigital Commc'ns Corp. & Samsung Elecs. Co.*, 528 F.Supp.2d 340, 354–55 (S.D.N.Y.2007). The arbitrator "must appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 209 (2d Cir.2002) (citations omitted).

■ "Where the arbitrators have failed to document the reasoning behind their decision—a perfectly acceptable practice in arbitration—courts must consider the facts and the law to determine whether the allegedly disregarded law was clearly applicable and ignored." *Colonial Penn Ins. Co. v. Am. Centennial Ins. Co.*, No. 96 Civ. 6051(MBM), 1997 WL 10004, at *3 (S.D.N.Y. Jan. 10, 1997) (citing *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 112 (2d Cir.1993)).

■ "In the context of contract interpretation, [courts] are required to confirm arbitration awards despite 'serious reservations about the soundness of the arbitrator's reading of the contract.'" *Stolt–Nielsen*, 548 F.3d at 92 (quoting *Westerbeke*, 304 F.3d at 216 n. 10). However, vacatur is appropriate, if an award "contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke*, 304 F.3d at 214.

## II. *Notice Requirement in the Treaties*

■ There is no clearly established rule that a reinsured must give notice to its reinsurer. In New York, a reinsurer must show that the failure to give notice was prejudicial or material to the reinsurance contract. *See Unigard Security Ins. Co. v. N. River Ins. Co.*, 79 N.Y.2d 576, 584, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992); *see also N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1213 (3d Cir.1995) (holding reinsurer must demonstrate prejudice or bad faith for failure to give notice). However, under Massachusetts law, notice is required. *Liberty Mut. Ins. Co. v. Gibbs*, 773 F.2d 15, 18 (1st Cir.1985). While the Final Award does not offer an explanation on this point, nothing in the record suggests that the failure to give notice of Global's negotiations with Home regarding the Home Settlement was material to the Treaties or prejudicial to Argonaut. Accordingly, giv-

en the uncertainty in the law and lack of evidence showing prejudice, this Court cannot find that there was a manifest disregard of the law.

### III. *The Treaties' Definition of Loss Occurrence*

■ The Treaties define "Loss Occurrence" as "any one disaster, casualty, accident, or loss or series of disasters ... arising out of or caused by one event or occurrence." In construing that language, the Panel found that the Original Reinsurance Contracts between Home and Global included all of the claims and Commutations at issue between the parties. While a narrow reading of the "Loss Occurrence" clause to particular losses that had already occurred might exclude contingent liabilities, the Treaties were interpreted by the Panel as "honorable undertakings" not as strict legal documents. Because the Panel was given substantial freedom to interpret the Treaties and offered a colorable justification for their interpretation based on industry practices, this Court cannot conclude that they ignored the "Loss Occurrence" definition. Therefore, the Panel's interpretation does not warrant vacatur.

### IV. *Follow the Settlements Doctrine*

■ The "follow-the-settlements" (or "follow-the-fortunes") doctrine "binds a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation." *N. River Ins. Co. v. Ace Am. Reins. Co.*, 361 F.3d 134, 139 (2d Cir.2004) (quoting *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 85 (2d Cir.2003)). "This doctrine insulates a reinsured's liability determinations from challenge by a reinsurer unless they are fraudulent, in bad faith, or the payments are clearly beyond the scope of the original policy or in excess of the reinsurer's agree-

ment to exposure." *N. River Ins.*, 361 F.3d at 140 (quoting *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir.1992)). However, "while the 'follow the fortunes' clause limits a reinsurer's defenses, it does not make a reinsurer liable for risks beyond what was agreed upon in the reinsurance certificate...." *CIGNA*, 52 F.3d at 1199.

■ Here, the Panel determined that "[t]he evidence presented at the Hearing established that the ... claims comprising the commutation transaction were covered by the original reinsurance contracts issued by [Global]." Once the Panel interpreted the Treaties to include contingent claims as a loss covered under the Treaties, the Panel properly applied the "follow-the-fortunes" doctrine to preclude review of Global's decision to settle the contingent claims. Accordingly, because the Panel properly applied the "follow-the-fortunes" doctrine to its interpretation of the scope of the Treaties, there was no manifest disregard of the law.

### V. *Confirmation of the Award*

■ Argonaut does not oppose confirmation of the nine non-Commutation claims, and this Court finds no reason to vacate the Commutations. "Normally, confirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir.2006) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir.1984)). Accordingly, this Court confirms the Award in its entirety.

### VI. *Attorneys' Fees and Interest*

■ In diversity cases, such as this one, pre-judgment interest is governed by state law. *Capgemini U.S. LLC v. Sorensen*, No. 04 Civ. 7584(JGK), 2005 WL

1560482, at \*11 (S.D.N.Y. July 1, 2005). Under New York choice of law principles, the law of the jurisdiction applied to determine liability also controls the allowance of pre-judgment interest. *See Schwartz v. Twin City Fire Ins. Co.*, 492 F.Supp.2d 308, 323 (S.D.N.Y.2007). Because the parties have not articulated any other state's law that should be applied and New York has a substantial interest as the place of contracting and arbitration, this Court will look to New York law regarding pre-judgment interest. *See Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co.*, 295 F.3d 256, 260–61 (2d Cir.2002) (explaining New York's contract choice of law rules). "Under New York law, interest shall be recovered on an arbitration award." *Capgemini*, 2005 WL 1560482, at \*11; *see also* N.Y.C.P.L.R. § 5002. New York law provides for an interest rate of nine percent per annum. N.Y.C.P.L.R. § 5004. Accordingly, Global is entitled to receive post-award/pre-judgment interest at the rate of nine percent per annum.

█ The Panel awarded pre-award interest, so this interest award runs from the date of the Award until the date Argonaut paid. However, the date the interest runs from is complicated by the fact that the Award was amended. In the analogous situation of post-judgment interest where the judgment is amended, "post-judgment interest should be calculated from whenever judgment was first ascertained in a meaningful way." *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 103 (2d Cir.2004). The Award was ascertainable, even though it was later amended, from the date of the original award. Accordingly, Global is entitled to post-award, pre-judgment interest running from July 12, 2007, until August 24, 2007. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 55 (2d Cir.1998) (awarding post-judgment interest from original judgment where the judgment was later amended).

█ "Generally, courts may not award attorneys' fees to a prevailing party absent statutory or contractual authority." *Amalgamated Clothing & Textile Workers Union v. Wal–Mart Stores, Inc.*, 54 F.3d 69, 71 (2d Cir.1995). Global points to no statutory authority for an award of attorneys' fees, and the Treaties provide for an award of fees only by direction of the Panel. The arbitrators did not award any attorneys' fees. Therefore, Global's request for attorneys' fees in this forum is denied.

## CONCLUSION

For the foregoing reasons, Global's petition to confirm the July 12, 2007 arbitration award as amended on August 23, 2007, is granted, and Argonaut's petition to vacate the award in part is denied. Global's request for post-award/pre-judgment interest at the rate of nine percent per annum for the period July 12, 2007 until August 24, 2007 is granted. Finally, Global's application for attorneys' fees is denied. The Parties shall submit a final judgment consistent with this Memorandum and Order by March 31, 2009. The Clerk of the Court is directed to terminate all pending motions and to mark this case as closed.

SO ORDERED.